## A01A0495. TUKES v. THE STATE.
(550 SE2d 678)

JOHNSON, Presiding Judge.

Kenneth Tukes was found guilty of one count of theft by conversion and two counts of theft by taking in connection with three purported car sales.

1. Tukes challenges the sufficiency of the evidence to support his convictions. He contends that the convictions cannot stand because his failure to perform as promised under the agreements at most amounts to breach of contract, not theft by conversion or theft by taking. We disagree.

(a) *Theft by conversion.* The indictment charged Tukes with theft by conversion, stating that he, "being in lawful possession of $1750.00, the property of Wanda Denise Cuyler, as owner or custodian, unlawfully and without authority appropriate[d] said property

---

to [his] own use with the intention of depriving" Cuyler of its use or possession.

OCGA § 16-8-4 (a) provides, in pertinent part, that a person commits the offense of theft by conversion when, having lawfully obtained funds of another, under an agreement or other known legal obligation to make a specified application of such funds, he knowingly converts the funds to his own use in violation of the agreement or legal obligation.

The evidence, viewed in a light most favorable to the verdict, shows that Tukes told Cuyler that he owned a finance company and was planning to open a used car business. About a month later, Cuyler wrecked her car and contacted Tukes, telling him she wanted to buy a sport utility vehicle. Tukes replied that he had two such vehicles on hand and requested a down payment. After Cuyler saved some money toward a down payment, Tukes brought a Jeep Cherokee to show her. Tukes requested a $1,500 down payment, but Cuyler could give him only $250. Cuyler said that she would have the balance of the down payment within a week. Tukes agreed to hold the car for her.

Two weeks passed before Cuyler was able to accumulate the balance of the down payment. When she presented it to Tukes, he told her that she had forfeited the $250 payment she made earlier and that she would need to pay the entire $1,500 down payment if she wanted the car. Cuyler gave him $1,500. Rather than giving her the promised vehicle at that time, however, Tukes told her that a Jeep was on order for her and that she would have it in a week or two. When Cuyler said she needed a car immediately, Tukes said he would let her use his pickup truck. She drove it for two days before it stopped running. Two weeks later another man, apparently the truck's true owner, came and took the truck from Cuyler's driveway. Tukes never delivered the Jeep or another vehicle to Cuyler. And although he made several appointments to meet Cuyler to refund her money, Tukes never showed up for the appointments and did not refund any of her money.

Tukes is correct that OCGA § 16-8-4 is not intended to punish a simple breach of contract. The presence of fraudulent intent, however, distinguishes theft by conversion from breach of contract.[1] There was evidence of fraudulent intent in this case. For example, Tukes told Cuyler he had a Jeep on order for her, repeatedly asked for money from her but never delivered a Jeep or comparable vehicle, and, although he made arrangements to do so, never refunded any of her money.

---

[1] See *Scarber v. State*, 211 Ga. App. 260 (439 SE2d 83) (1993).

In addition, there was evidence that Tukes had entered into agreements with several people in which he took their cars and either promised to take over their loan payments or promised to sell their cars to others but then failed to pay for or return the cars.[2] The evidence was sufficient.

We point out that this case is different from those in which the state failed to prove criminal intent, such as where the defendant was late performing under an agreement and then did a poor job[3] or where the defendant delegated to a neighbor his duty to return rental equipment, but the neighbor failed to return it.[4] In this case, the trier of fact was authorized to find from the evidence presented the fraudulent intent necessary to support a theft by conversion conviction.[5]

(b) *Theft by taking.* The indictment charged Tukes with two counts of theft by taking. The first count accused him of theft by taking a motor vehicle, stating that he "did take a 1996 Chevrolet Camaro, the property of Michael Gibbs, with a value of approximately $18,000.00, with the intention of depriving said owner of said property, contrary to the laws of said State. . . ." The second count charged Tukes with taking a motor vehicle, in that he "did take a

---

[2] For example, in one of the two theft by taking offenses discussed below, Tukes took possession of the owners' truck, promised to take over their monthly payments, then made no payments; in the other case, he took the owners' car after promising to make the payments, took a down payment from a buyer, and failed to make any payments or share the proceeds he received with the owners.

In another instance, the owner of a Mercedes-Benz sought to sell his car by placing an advertisement in the newspaper. Tukes responded to the ad and told the owner he owned a used car lot and had a buyer for the car. Tukes asked the owner to allow him to drive the car to Atlanta so he could sell it. With the owner's permission, Tukes took the car. Tukes never returned the car or any sales proceeds. A month later, the owner found the car in an impound lot and retook possession of it.

In another case, the owner of a Nissan advertised her car for sale. Tukes responded, telling her he would buy her car by taking over her loan payments. Because she owed more than the car was worth, the owner gave Tukes $500. He assured her that he would contact the lender the next business day to put the loan in his own name. When the owner called the lender the following business day, she was told that Tukes had not called. The owner called Tukes, who denied having agreed to change the name on the loan, and who insisted that he agreed only to lease, not buy, the car. He told her that over the weekend her car had been broken into and her CD player stolen and that she could pick up the car at a particular location, which she did. In a similar case, the owner of a Toyota 4-Runner advertised his vehicle for sale. Tukes offered to buy it by taking over the payments. Tukes demanded that the owner pay him $400 or $500 to repair dents in the vehicle, but the owner gave him only $50. A short time later, the owner became suspicious and told Tukes he was uncomfortable with the transaction. Tukes tried to reassure him, but the owner called police. The next morning, the owner recovered the vehicle from an impound lot.

[3] See *Myrick v. State*, 210 Ga. App. 393 (436 SE2d 100) (1993).

[4] See *Barrett v. State*, 207 Ga. App. 370 (427 SE2d 845) (1993).

[5] See *Cottrell v. State*, 210 Ga. App. 55, 57 (435 SE2d 272) (1993); *Byrd v. State*, 186 Ga. App. 446, 447 (1) (367 SE2d 300) (1988); see generally *Lovell v. State*, 235 Ga. App. 140, 141 (1) (a) (508 SE2d 771) (1998).

1995 Z-71 Chevrolet truck, the property of Michael Gibbs, with a value of approximately $20,000.00, with the intention of depriving said owner of said property, contrary to the laws of said State. . . ."

A person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property.[6]

The evidence shows that Michael and Cathy Gibbs wanted to sell their pickup truck and placed an advertisement in the paper. Tukes responded to the ad and offered to buy the truck. Tukes prepared a contract in which he agreed to buy the truck by paying $447.35 each month for 54 months. Although the agreement indicates that Tukes was to make the payments to Cathy Gibbs, the parties understood that Tukes would take over the Gibbses' monthly debt payments to the creditor and take the loan out of the Gibbses' names. The contract, which was termed a "LEASE/PURCHASE" agreement, also specified that Tukes, the "Lessee/Buyer," would have to keep the truck insured and in good repair, that Cathy Gibbs would have the right to inspect the vehicle at least once a month, and that if Tukes defaulted on any of the terms of the agreement, Cathy Gibbs would have the right to repossess the vehicle. Tukes and Cathy Gibbs signed the contract, and the Gibbses gave Tukes possession of the truck.

About a month later, Tukes told the Gibbses that if they were interested in selling their Camaro, he would buy it. The Gibbses agreed to sell the car, and at Tukes' request, Cathy Gibbs drove the Camaro to another town to show it to a potential buyer. Tukes had promised to pay Cathy Gibbs $200 for driving the car out of town, but he paid her only $100. The buyer gave Tukes $1,500 as a down payment, then took the car.

Tukes orally promised the Gibbses that he would pay for the car by making the monthly car payments as they came due. Tukes had not prepared any written agreement or documents memorializing the transaction but promised to meet the Gibbses at their home with the paperwork the next morning. When Tukes failed to arrive as promised, the Gibbses phoned him. He said he was waiting for the credit union to open and would come by later. Tukes never showed up and never returned the Gibbses' car. Other than the $100 Tukes gave Cathy Gibbs for driving the car out of town, the Gibbses did not receive any money for the car. The Gibbses recovered the car from an impound lot three weeks later. Tukes had made no payments on the car or the truck after he took possession of the vehicles.

---

[6] OCGA § 16-8-2.

If a person, meaning to steal another's goods, fraudulently prevails on the latter to deliver them to him, under the understanding that the property in them is to pass, he does not commit a crime by the taking, unless the transaction involves that criminal intent which would support an indictment.[7] If, with fraudulent intent, he gets leave to take possession only and takes and converts the whole to himself, he becomes guilty of larceny, because, while his intent is thus to appropriate the property, the consent which he fraudulently obtained covers no more than the possession.[8]

(i) *The Camaro.* There was evidence that Tukes, with fraudulent intent, was given only *possession* of the Camaro at the time he took it and then converted the vehicle to himself. Although the Gibbses had intended to sell the car to Tukes, the transaction had not been completed at the time he took the car. The Gibbses consented to Tukes taking possession of the car that evening, subject to his returning early the next morning to provide and complete the paperwork necessary to complete the transaction. Indeed, Cathy Gibbs testified that Tukes indicated that he would bring the paperwork the next day "to accomplish that sale." Tukes was also expected to remove the Gibbses' names from the loan, a task which he did not complete. A jury could have found that the Gibbses had no intention of passing title to Tukes at the time he, with fraudulent intent, got leave to take possession of the vehicle. The theft by taking conviction was supported by the evidence.

Moreover, the broad definition of theft by taking in OCGA § 16-8-2 includes thefts perpetrated by deception and by conversion.[9] The real issue, therefore, was Tukes' intent.[10] From the evidence presented, including the similar transaction evidence, the jury could infer that Tukes possessed the criminal intent necessary to deprive the owners of their property. The evidence is sufficient under the standard of *Jackson v. Virginia*[11] to authorize the jury's finding that Tukes is guilty of theft by taking the Camaro as alleged in the indictment.[12]

(ii) *The truck.* Cathy Gibbs signed an agreement in which she expressly retained a security interest in the truck. The contract gave her the right to, among other things, retake possession of the truck if Tukes defaulted on his payments. The Gibbses did not convey their entire interest in the vehicle, but delivered no more than possession

---

[7] See *Gill v. State*, 197 Ga. App. 558, 559 (1) (398 SE2d 833) (1990).
[8] Id. at 559-560.
[9] *Romano v. State*, 233 Ga. App. 149, 152 (2) (503 SE2d 380) (1998).
[10] See id.
[11] 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[12] See *Romano*, supra.

until certain other specific conditions were met. The issue of whether a seller retains a security interest in the goods is an important consideration in this type of case.[13] There being evidence that Tukes, with fraudulent intent, got leave to take possession only of the truck, then took the truck and converted it to himself, the jury was authorized to find Tukes guilty, beyond a reasonable doubt, of theft by taking the truck.

2. Tukes contends that the trial court erred in joining the theft by conversion and theft by taking charges for trial, when the incidents involved different victims, different schemes, and different witnesses. We disagree.

Where offenses have been joined for trial solely on the ground that they are of the same or similar character, the defendant has an absolute right to a severance of the offenses.[14] However, where joinder is based on the same conduct or on a series of acts connected together that evince an ongoing criminality, the question of joinder or severance is within the sound discretion of the trial court.[15] Offenses are not joined solely because they are of the same or similar character where the similarity reaches the level of a pattern evincing a common motive, plan, scheme, or bent of mind.[16]

All three of the incidents here occurred in or around October 1996 and involved Tukes holding himself out as a car dealer, meeting the buyer or seller and conducting the transaction at a location other than a car lot, purporting to buy or sell a vehicle, and failing to pay for or deliver a vehicle as promised. The offenses constituted a series of acts connected together that evince an ongoing criminality and show a pattern evincing a common motive, plan, scheme, or bent of mind. The trial court did not abuse its discretion in deciding to try the offenses together.

3. Tukes argues that the trial court erred in admitting evidence of similar transactions because the state did not indicate the purpose for which it sought to introduce the evidence.[17] Our review of the record belies this argument. In its "Notice to Present Evidence of Similar Transactions," the state specifically indicates that its purpose for seeking to introduce the evidence is to establish Tukes' scheme, motive, bent of mind, or course of conduct. These are proper purposes.[18]

*Judgment affirmed. Ruffin and Ellington, JJ., concur.*

---

[13] See *Elliott v. State*, 149 Ga. App. 579, 580 (1) (254 SE2d 900) (1979).
[14] *Cobb v. State*, 236 Ga. App. 265, 268 (2) (511 SE2d 522) (1999).
[15] Id.
[16] Id.
[17] See *Rodriguez v. State*, 211 Ga. App. 256, 258 (4) (a) (439 SE2d 510) (1993).
[18] See *King v. State*, 246 Ga. App. 100, 101 (2) (539 SE2d 614) (2000).

DECIDED JUNE 18, 2001.

*Grantham & Peterson, William M. Peterson*, for appellant.

*Kelly R. Burke, District Attorney, Amy L. Smith, Assistant District Attorney*, for appellee.