A02A1261. McMAHON v. THE STATE.
(574 SE2d 548)

POPE, Senior Appellate Judge.

A jury found Francis James McMahon, Sr. guilty of seven counts of theft by taking related to an agreement to build a home for Phillip and Karen Morgan. McMahon appeals, arguing, among other things, that the trial court erred in refusing to direct a verdict for him on these charges.

We review the denial of a motion for directed verdict of acquittal under the same standard used to review the sufficiency of the evidence. See *Parker v. State*, 250 Ga. App. 768 (552 SE2d 919) (2001). Thus, we must " 'view the evidence in the light most favorable to the jury's verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Id.

So viewed, the evidence shows that, in June 1996, well before the Morgans became involved, McMahon's construction company, Tri-Mac, Inc., had a contract to build a house on lot 40A of the Streamwood Village Subdivision in Gwinnett County. On behalf of Tri-Mac, McMahon obtained a construction loan from Brand Bank, which was secured by the property through a deed to secure debt. But the purchase contract fell through, and the lot remained empty for many months.

On May 1, 1997, the Morgans, who were retiring, offered to purchase a home to be constructed by Tri-Mac on the same lot and tendered two checks to Tri-Mac totaling $33,000 with the offer; they had earlier paid $5,000 to reserve the lot. On May 5, the Morgans and Tri-Mac executed a construction and purchase agreement pursuant to which Tri-Mac agreed to build and the Morgans agreed to buy a custom home in the subdivision for $295,500. The Morgans agreed to make payments in cash, and the purchase contract established the payment and construction schedule. Pursuant to that schedule, Tri-Mac promised to "attempt to complete the project by October 31, 1997," but the closing date was set for November 30, 1997.

In May or June, in an effort to obtain a renewal on the earlier construction loan, McMahon altered a copy of the Morgans' agreement so that the bank would not know that the Morgans were paying cash and submitted it to the bank. Thereafter, despite receiving cash payments from the Morgans, Tri-Mac also obtained draws on the construction loan totaling $130,000 between July 1997 and November 1997.

Between May 29 and September 18, 1997, the Morgans made six payments to Tri-Mac totaling $204,500. In October and November, the Morgans and McMahon twice amended the agreement to incorporate $5,000 and $3,000 worth of changes, respectively, and the Morgans gave McMahon checks for those amounts made out to Tri-Mac. All together, the Morgans paid Tri-Mac $250,500, or approximately 83 percent of the purchase price.

Although construction proceeded on schedule through July, at the beginning of August the Morgans expressed concern to McMahon about the lack of progress. McMahon assured them that the project would be completed on time. The Morgans raised similar concerns in September, and again McMahon told them not to worry. In late October and early November, progress on the house was "sporadic, just enough to keep us kind of going and thinking that things were going to get completed," according to Phillip Morgan.

Finally, in early January 1998 the Morgans learned that subcontractors were not being paid. In fact five subcontractors had placed liens on the property for claims arising between September 6, 1997, and December 11, 1997. The Morgans also discovered that Brand Bank had a deed to secure debt on the property. The Morgans met with McMahon, who acknowledged that he was having financial difficulties and promised to finish the house within 30 days and take care of the encumbrances. Nevertheless, McMahon performed no additional work on the house. Ultimately, Tri-Mac failed to repay the construction loan, and the bank foreclosed on the property in March 1998. The Morgans later purchased the property from the bank for approximately $182,000. They also paid an additional $75,000 to finish the construction. In total, the Morgans spent over $507,000 to build their house.

The State brought a 21-count indictment against McMahon, charging him with ten counts of theft by taking (Counts 1 through 10), ten counts of conversion of payments for real property improvements (Counts 11 through 20), and one Racketeer Influenced and Corrupt Organizations Act violation (Count 21). The theft by taking and conversion charges related to ten payments the Morgans made under the purchase contract between April 9, 1997, and November 10, 1997. Following the State's presentation of evidence, the trial court granted McMahon's motion for directed verdict on the RICO charge and the ten conversion counts. The trial court denied McMahon's motion as to the theft by taking charges. The jury subsequently acquitted McMahon of theft by taking as alleged in Counts 1 through 3 but found him guilty of the remaining seven theft by taking charges — Counts 4 through 10.

1. On appeal, McMahon argues that the trial court erred in failing to grant him a directed verdict on Counts 4 through 10.[1] He asserts, among other things, that the State failed to prove an unlawful taking, as alleged in the indictment.

"A person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." OCGA § 16-8-2.

> The phrase "regardless of the manner in which the property is taken or appropriated" is broad enough to encompass theft by deception. Thus, a state may indict an individual for theft by taking, yet prove the elements of theft by deception. See, e.g., *Stull v. State*, 230 Ga. 99, 101 (1) (196 SE2d 7) (1973); *Byrd v. State*, 186 Ga. App. 446, 447 (1) (367 SE2d 300) (1988).

*Elder v. State*, 230 Ga. App. 122, 123-124 (1) (495 SE2d 596) (1998). "A person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." OCGA § 16-8-3 (a). "A person deceives if he intentionally: (1) creates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false; [or] (2) Fails to correct a false impression of an existing fact or past event which he has previously created or confirmed. . . ." OCGA § 16-8-3 (b). Pursuant to the contract, McMahon had promised to convey good and marketable title to the Morgans at the time of closing. As shown by the facts, despite the fact that the Morgans were paying cash for the construction of their home, McMahon fraudulently obtained a construction loan on the project, which he knew would result in the bank obtaining a security interest in the Morgans' home. He only promised to repay the loan by January 3, 1998, one month after the proposed closing with the Morgans. He took these steps in May or June 1997 and concealed that information from the Morgans. So, each time he received a payment from the Morgans after June 1997, he did so knowing that, in exchange, the Morgans were not getting what they were paying for — construction of a house that they would own free and clear of any construction lien. Indeed, the jury found McMahon guilty of theft by taking for each of the seven payments

---

[1] McMahon also alleges that the trial court erred in not granting a directed verdict on Counts 1 through 3. Any such error, however, was rendered moot by the jury's not-guilty verdict on those charges. See *Harridge v. State*, 243 Ga. App. 658, 663 (4) (534 SE2d 113) (2000).

that occurred after McMahon defrauded the bank to obtain the loan and not guilty for the payments that occurred prior to that date. McMahon obtained the Morgans' money by creating the impression that the Morgans were paying for a house on which there would be no construction lien. A jury could infer that McMahon possessed the criminal intent necessary to deprive the Morgans of their money. It follows that sufficient evidence was presented to support the verdicts for theft by taking. See *Tukes v. State*, 250 Ga. App. 117, 118 (1) (b) (550 SE2d 678) (2001). Compare *Holt v. State*, 184 Ga. App. 664, 666 (362 SE2d 464) (1987) (without more, failure to complete contracted work not a crime).

We do not agree that the altered contract McMahon submitted to the bank is evidence of his intent to deprive the Morgans of their property. Rather, his secret knowledge from that day forward that the Morgans were paying cash for a house owned by the bank is evidence of that intent. Their money was not being put to use for their benefit, as implied by the dissent, but for the benefit of the bank.

Finally, "[a]n officer or agent of a corporation cannot assert that criminal acts, in [the] form [of] corporate acts, were not his acts merely because carried out by him through the instrumentality of the corporation which he controlled and dominated in all respects and which he employed for that purpose." (Citations and punctuation omitted.) *Williams v. State*, 158 Ga. App. 384, 387 (3) (280 SE2d 365) (1981).

2. McMahon contends that the trial court erred by failing to apply the principle of lenity in order to grant his directed verdict on the same counts. He argues that he was entitled to a directed verdict because he was charged with both theft by taking (OCGA §§ 16-8-2; 16-8-12) and conversion of payments for real property improvements (OCGA § 16-8-15) with respect to the same checks, and the latter charge carries a lighter sentence. See generally *Gee v. State*, 225 Ga. 669, 676-677 (171 SE2d 291) (1969) ("Where there are two sections in a statute providing a punishment or penalty for the same act or offense, one providing a greater and the other a lesser, the section prescribing the greater is abrogated by the one prescribing the lesser. Where any uncertainty develops as to which penal clause is applicable, the accused is entitled to have the lesser of two penalties administered.") (citations and punctuation omitted).

But, we find that principle inapplicable here, where the facts do not support a conviction under both of the crimes. Generally, OCGA § 16-8-15 requires the State to show that the defendant contractor used *lawfully obtained* payments made for real property improvements for some purpose other than to pay for the labor or materials for the improvement, all while bills for that labor or materials remained unpaid. The court held that the State did not present evidence to show that any such bills remained unpaid and, accordingly,

granted a directed verdict. The State did, however, present evidence to show that McMahon *unlawfully* obtained the Morgans' payments because he knew and failed to disclose the presence of the first mortgage on the property. Therefore, there was no uncertainty regarding which penal clause was applicable.

3. Because we found sufficient evidence to support the convictions as charged in Counts 4 through 10 of the indictment, there was no fatal variance between the acts charged in those counts and the evidence presented at trial.

4. McMahon contends that the trial court erred by overruling his objection to part of the State's closing argument. The State argued that Tri-Mac was a "sham" corporation, and McMahon objected on the grounds that there was no evidence other than that the corporation was a valid, legitimate corporation. The court instructed the jury that closing argument was not evidence and that the jury must remember the evidence and apply the law as given by the court. McMahon did not object to the limiting instruction. "[P]rosecutors are granted wide latitude in conducting closing argument, and defining the bounds of such argument is within the trial court's discretion." *Arnold v. State*, 249 Ga. App. 156, 162 (4) (545 SE2d 312) (2001). There was some testimony about McMahon's attitude toward the corporation; the court gave a limiting instruction; and McMahon did not further object. We cannot conclude that the trial court abused its discretion.

5. McMahon also contends the trial court erred by admitting similar transaction evidence. He contends the incident was dissimilar and that it was not admitted for a proper purpose. The admissibility of similar transaction evidence is contingent upon three affirmative showings:

(1) the evidence must be admitted for a proper purpose; (2) there must be sufficient evidence to establish the accused committed the independent act; and (3) there must be a sufficient connection or similarity between the independent offense and the crime charged so that proof of the former tends to prove the latter. [Cit.]

*Gardner v. State*, 273 Ga. 809, 810 (2) (546 SE2d 490) (2001). The burden of proof at a similar transaction hearing is only the preponderance of the evidence. *Freeman v. State*, 268 Ga. 185, 188 (4) (486 SE2d 348) (1997). " 'The decision to admit prior similar transaction evidence is within the discretion of the trial court and will not be disturbed absent an abuse of discretion.' [Cit.]" *Smalls v. State*, 251 Ga. App. 516, 517-518 (2) (554 SE2d 273) (2001).

At the similar transaction hearing, Marie Pendley testified that she had to sue McMahon concerning a business venture that

occurred about one year before the Morgans were having their house built. She testified that when she was in her sixties, ill, and depressed from the loss of her husband, and at a point when she was unable to sell a home that she owned, McMahon proposed that the two go into business together to modify the home for use as an assisted living facility. In exchange for a promissory note, she loaned McMahon $50,000 for the purpose of making improvements on the house and asked for a contract showing what McMahon intended to do. But McMahon never provided a contract, never did any work, and refused to return the money. She was forced to file a civil action against McMahon to get her money back.

The State contends the incident shows McMahon's bent of mind, course of conduct, and intent. The State contends that the incident is similar in that it shows McMahon taking advantage of an elderly person by obtaining money from that person for a construction project with no intent to follow through. We cannot find an abuse of discretion. The evidence raises an inference that McMahon took Pendley's money with fraudulent intent. See *Urness v. State*, 251 Ga. App. 401, 403 (1) (554 SE2d 546) (2001) (testimony that a person was in possession of employers' cash and was responsible for depositing it but never did is evidence that she stole the money). With regard to similarity,

> [t]here is no requirement that the other transaction must be identical in every aspect. The test of admissibility of evidence of other criminal acts by the defendant is not the number of similarities between the two incidents. Rather, such evidence may be admitted if it is substantially relevant for some purpose other than to show a probability that the defendant committed the crime on trial because he is a man of criminal character.

(Citations and punctuation omitted.) *Smith v. State*, 203 Ga. App. 3, 4 (416 SE2d 129) (1992).

*Judgment affirmed. Johnson, P. J., Barnes, Phipps and Mikell, JJ., concur. Andrews, P. J., and Ruffin, P. J., dissent.*

RUFFIN, Presiding Judge, dissenting.

I agree with the majority that Francis McMahon acted criminally in obtaining money from a bank for a construction loan while simultaneously receiving cash from the Morgans. However, I disagree that McMahon was guilty of theft by taking from the Morgans, the only offense for which he was convicted. Accordingly, I must respectfully dissent.

McMahon was charged under OCGA § 16-8-2, which provides that "[a] person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully

appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." The statute thus defines two alternative types of theft — an unlawful taking of property or an unlawful appropriation of property lawfully obtained.[2] Here, the State charged McMahon solely with unlawful taking. And, to sustain a conviction for this offense, "the evidence must show that the requisite intent to deprive the owner of the property was present *at the time of the taking*."[3] In this case, I do not believe the evidence supports the conclusion that McMahon intended to steal from the Morgans at the time he took the money.

Pursuant to the contract between McMahon and the Morgans, the Morgans delivered seven payments to McMahon to fund the house construction,[4] and McMahon — or his company — completed 70 to 80 percent of the home. On appeal, the State argues that "while work may have been performed at the site, the money provided by the Morgans did not make its way to the people who were actually doing the work and/or providing materials." Undoubtedly, McMahon had cash-flow problems, and his foreman testified generally that McMahon failed to pay some subcontractors. The five subcontractor liens introduced by the State, however, provide the only evidence regarding the amount of nonpayment, and those liens show approximately $29,000 in claims. The evidence further shows that, beginning July 2, 1997, the Morgans made seven separate payments totaling $161,000 to McMahon.

Given the substantial sum paid by the Morgans, the percentage of work completed, and the evidence that subcontractors filed only $29,000 in liens against the property, the State's claim that *none* of the Morgans' money reached those actually doing the work lacks a factual basis. And I cannot agree that McMahon's alleged failure to pay these subcontractors $29,000 raises a reasonable inference that, when the Morgans delivered the seven separate payments to McMahon, he intended to use each of them for some purpose other than funding the construction. The State presented no evidence that might be probative of intent, such as proof regarding how McMahon planned to use this money when received or how the individual payments were, in fact, spent. I only know that they were deposited into a Tri-Mac account and significant work was completed on the house.[5]

---

[2] See *Spray v. State*, 223 Ga. App. 154, 155 (1) (476 SE2d 878) (1996); *Walker v. State*, 146 Ga. App. 237, 239 (1) (a) (246 SE2d 206) (1978).

[3] (Emphasis supplied.) *Spray*, supra at 156.

[4] The Morgans actually made additional payments to McMahon, but he was found guilty of theft by taking for seven of the payments.

[5] Only the final two payments in October and November 1997 were earmarked for particular work – the alterations to the original construction plans. The State has pointed to no

Any conclusion that particular payments were used on something other than the Morgans' home would be speculation, as would any conclusion that McMahon intended to misuse the individual payments upon receipt.

At trial, the State argued that the altered contract McMahon submitted to Brand Bank "is evidence that [McMahon] intended to steal from the [Morgans] from the very get-go of this endeavor." I simply do not believe that McMahon's misrepresentations to the *bank* provide insight into his intent with respect to the Morgans. From the evidence, a jury could find that McMahon misled the bank to obtain additional funds. That finding, however, does not create an inference that McMahon accepted payments from the Morgans between July and November 1997 with the intention to use their money for some purpose other than building their home.

Having charged McMahon with an unlawful taking, the State bore the burden of demonstrating McMahon's criminal intent *at the time he received each payment.*[6] The evidence shows that McMahon experienced financial difficulties, did not finish the Morgans' home, misled the bank to obtain construction loan payments, and failed to repay that loan, resulting in the foreclosure. But the State offered no evidence that, when the Morgans paid McMahon between July and November 1997, McMahon intended to use their money for some purpose other than building their house.[7] Accordingly, I do not believe that the evidence supports the jury's verdict that McMahon was guilty of theft by taking.

Evidently, the majority believes that McMahon was guilty of theft by deception. And, as noted by the majority, the State may indict a person for theft by taking and prove theft by deception, because "[t]he phrase 'regardless of the manner in which the property is taken or appropriated' [in OCGA § 16-8-2] is broad enough to encompass theft by deception."[8] Nonetheless, the State still must prove present intent to deceive because, however broad the statute

---

evidence that these alterations were not completed or that McMahon accepted the payments with the intention not to complete the specified work.

[6] See *Spray*, supra.

[7] See *Walker*, supra at 239-240, 242-243 (1) (b). Cf. *Elder v. State*, 230 Ga. App. 122, 124 (2) (495 SE2d 596) (1998) (given evidence that defendant deceived investors about investment opportunity, jury could conclude that defendant unlawfully took investors' money); *Spray*, supra (jury could reasonably conclude that public official intended to take state property for his own personal use at time he received it and thus was guilty of an unlawful taking); *Bell v. State*, 220 Ga. App. 293, 294 (1) (469 SE2d 714) (1996) (jury could conclude that defendant deceived car salesman into allowing him to test drive truck, which he then stole, "and that such deception constituted an unlawful taking"); *Mullen v. State*, 203 Ga. App. 170, 172 (2) (416 SE2d 784) (1992) (although bank gave defendant access to money, she "was well aware that she was obtaining funds which did not belong to her and which she had no right to receive," and thus could be found guilty of an unlawful taking).

[8] *Elder*, supra at 123-124 (1).

may be, it does not permit the State to indict a person for theft by taking and prove theft by appropriation.[9] And, contrary to the majority's conclusion, I do not believe that the mere fact that McMahon took money from the Morgans after obtaining a construction loan from the bank shows that McMahon had the present intent to deceive the Morgans. Again, McMahon's misrepresentations to the *bank* shed no light on his intent with respect to the Morgans. In view of the fact that McMahon virtually completed the Morgans' house, the evidence simply does not support the conclusion that McMahon intended to steal from them at the outset. Accordingly, I dissent.

I am authorized to state that Presiding Judge Andrews joins in this dissent.

DECIDED OCTOBER 28, 2002 — RECONSIDERATION DENIED NOVEMBER 21, 2002 ▮▮▮▮▮▮▮

*H. Edward Marks, Jr.*, for appellant.
*Daniel J. Porter, District Attorney, George F. Hutchinson III, Assistant District Attorney*, for appellee.