A02A2345. RASCH v. THE STATE.
(579 SE2d 817)

ADAMS, Judge.

Wayne Rasch appeals following his conviction on eighteen counts of securities violations and two counts of theft by taking. We affirm in part and reverse in part.

The state accused Rasch of operating a Ponzi scheme[1] over a four-year period. The evidence at trial showed that he induced a

---

[1] The term "[P]onzi scheme" refers to an investment scheme whereby returns to investors are financed, not through the success of an underlying business venture, but from the principal sums of newly attracted investors. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, attracting additional investors. (Citation omitted.) *In re Primeline Securities Corp.*, 295 F3d 1100, 1104, n. 2 (10th Cir. 2002).

number of individuals to invest their money with his company with the promise of a high return. The charges in the case stem from transactions with six individuals.

## Barbara Stevens

Barbara Stevens testified that in January 1993 she found Rasch's business, Financial Plans & Services, in the yellow pages and consulted him about investing for her retirement. Rasch told her that he could get her a higher return on her money than she was currently receiving through an investment in a business that she recalled dealt with toners or copy machines. She knew no other details about the business, except that Rasch told her that her money would go to individuals who could not get a loan from a bank. Stevens agreed to place $10,000 with Rasch and signed a "Private Placement Investment Note" that promised her a 13.8 percent annual return on her money. Stevens understood that Rasch would earn one percent for managing the investment. She testified that she did not consider this a loan of her money, but rather an investment. She said that Rasch held himself out as knowledgeable in financial matters, and she made the investment because she believed that Rasch would be able to achieve better results with her money than she could.

Stevens began receiving monthly interest checks from Rasch. But after talking with friends and her tax attorney, Stevens became nervous because the guaranteed return was so high. In April 1993, she asked for the return of one-half of her investment. And in July 1993, she received a check for $5,000 plus interest from Rasch. Later, Stevens began to experience problems with the interest payments. Once, she was unable to cash an interest check because there was no money in Rasch's account. Then Rasch began directing her to different banks, and on one occasion he paid her with a money order. She became "scared" about her money and asked to close her account. She eventually received all of her money back.

## Ada Jo Sisk

Ada Jo Sisk met Rasch through her brother-in-law, and Rasch asked her if she would be interested in investing through his company. Rasch told her that he "invested for people," and he offered a good rate of interest. In April 1993, Sisk decided to place $15,000 with Rasch. He told her that her money would be invested in a local business that sold computer paper. Rasch said that the man who owned the business did not want to deal with banks because they refused to loan him money when he was just starting out. Sisk signed a document entitled "Private Placement, Commercial Investment Note," which provided for a 12 percent annual return. She invested

an additional $10,000 in June 1993 and signed a similar note with the same return. In September 1993, she invested $5,000 more, but the note she signed at that point provided for a 15 percent return. All three notes stated that she would receive the interest upon the expiration of the note.

Sisk understood that these notes represented investments in the computer paper company, and she relied on Rasch to make her a profit on these investments. Rasch would bring monthly statements for her account to Sisk at her office. Later, he stopped bringing monthly statements, until she specifically asked for one in December 1994. Sometime that month she requested the return of all her money, but she did not receive her money until the end of May 1995.

A few months later, in November 1995, Rasch approached Sisk about making another investment. He told her that this investment would be used to help a local businessman acquire some equipment or machinery at a "rock bottom price," and that she would receive a 12 percent return within 90 days. Sisk decided to put $15,000 into this "opportunity," and she signed a "Factoring Agreement — Short Term." In the agreement, Sisk agreed to purchase an invoice that would be held as collateral for the agreement to repay her investment with interest.

A few months later, Sisk began experiencing some health and financial problems, and in June 1996, she asked for her money back. Rasch promised her that her money would be returned and eventually gave her a check for $16,410.41, but the check was "no good." Although Sisk obtained a judgment against Rasch, she has never received her money back. The state presented evidence that instead of investing Sisk's money, Rasch deposited it into his own account and used the proceeds to buy a car.

*Edna T. Davis*

Edna T. Davis placed $42,104 with Rasch on February 3, 1994, and another $25,000 on April 13, 1994. The two agreements signed in connection with these investments were entitled "Private Placement Commercial Note," and provided for a return of eight and one-quarter percent and eight percent respectively. In 1996, the attorney for Davis's executor contacted Rasch to discuss the investment. He testified that after speaking with Rasch, he was left with the impression that the investment involved some kind of mutual fund that Rasch's company was operating, and not a transaction with an individual. He stated that Rasch did not refer to Davis's transactions as loans, but rather as investments. The attorney eventually recovered the entire principal amount invested by Davis, but Rasch charged her service charges for collection, accounting, check issue and defer-

ment in the amount of $3,850.98, which exceeded any remaining interest earned on the account.

The state presented testimony indicating that Rasch never invested Davis's money, but rather used it to pay back other investors; to cover personal and business expenses; and to make an interest payment to Davis herself.

### Carolyn A. Schmitt and John Alexander

At the time of trial, Carolyn A. Schmitt was residing in the state Alzheimer's Unit in Social Circle, Georgia. Delores Benedict, the wife of Schmitt's cousin, testified at trial that in 1995 when Schmitt was 80 years old she moved back to Georgia to live with her brother, John Alexander. Benedict described Schmitt's mental state at that time as "confused." Alexander died on January 7, 1996. The next day, Rasch told Schmitt's family that he was handling her business affairs. Benedict became concerned when she learned that Rasch had power of attorney for Schmitt and that he planned to sell Schmitt's assets, and those of her late brother. Rasch told Benedict that he was planning to invest the money, but Benedict was aware that Schmitt already had someone in Colorado who handled her investments. Schmitt's family hired an attorney to investigate, and on her advice they applied for a guardianship for Schmitt. The probate judge eventually appointed a guardian for Schmitt's property, and later a guardian of her person, due to her deteriorating mental condition.

Rasch initially failed to respond to inquiries asking him to account for the money he retained on Schmitt's behalf. But he eventually admitted that at least $225,000 of Schmitt's and Alexander's money was invested with his company. Rasch also provided a number of agreements entitled "Loan Agreements (Factoring)" that had been signed by Schmitt at a time when he held power of attorney for her. Schmitt signed seven agreements on her own behalf, and three that indicated that they were investments transferred from her brother. Schmitt's seven agreements promised a return of eight percent on total investments of $158,640. The three agreements indicating that they were transferred to Schmitt from monies Alexander invested with Rasch prior to his death reflected a total principal investment of $68,000, also with a promised eight percent return. But unlike the factoring agreement signed by Sisk, these agreements did not provide for any collateral. Rasch never referred to these agreements as loans and never disclosed to anyone where the monies had been invested. Rasch did not refund these amounts, and there was evidence at trial that he used Schmitt's money to pay back Sisk and Stevens and also to pay his own bills.

## *Franklin Marshall*

Franklin Marshall signed a "Factoring Agreement" with Rasch's company on July 17, 1995, reflecting a $14,750 investment with a promised return of eight percent. Rasch told Marshall that eight percent would be the minimum and that his interest would vary from month to month. Indeed, an account statement provided by Rasch for October 1995 indicated that he had an annualized return at that point of 9.820 percent.

Rasch told Marshall that his money would be used to buy sales receipts from various companies. Rasch was going to pay the company owner the money owed on the receipts and then collect the money for the invoices plus interest, resulting in a profit for both Marshall and Rasch. Marshall's factoring agreement provided that the invoices Rasch purchased would serve as collateral and that Rasch's company was to receive one percent of the funds collected. At the time of trial, Rasch still owed Marshall over $8,000.

1. Rasch first contends that the trial court erred in denying his motion for directed verdict as to the charges of securities violations because the agreements and notes in this case are not securities. While the Georgia Securities Act defines a "security" to include notes or evidence of indebtedness,[2] OCGA § 10-5-2 (a) (26), Rasch contends that this definition should be interpreted as excluding the notes and agreements in this case because they provide for a fixed return and do not rely on the performance of any underlying business or venture to determine the return.

We agree that this Court cannot hold that an investment instrument is a security simply because it fits within the literal statutory definition. Our Supreme Court specifically rejected such a mechanistic approach in *Dunwoody Country Club v. Fortson*, 243 Ga. 236, 237 (253 SE2d 700) (1979). The court stated that "the label placed on the instrument by the parties or by the courts does not determine whether the instrument is a security. Instead, the characteristics of the instrument and the underlying economic reality are the signifi-

---

[2] "Security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of indebtedness, investment certificate, certificate of interest or participation in any profit-sharing agreement, certificate of interest in oil, gas, or other mineral rights, collateral trust certificates, preorganization certificate or subscription, transferable share, investment contract, viatical investment, voting-trust certificate, limited partnership interest, or beneficial interest in profits or earnings, or any other instrument commonly known as a security, including any certificate of interest or participation in, temporary or interim certificate for, receipt for, guaranty of, or warrant or right to subscribe to or purchase, any of the foregoing. OCGA § 10-5-2 (a) (26).

cant factors for a court to consider in classifying an instrument as a security." Id. at 238.

Rather, Georgia has adopted the test laid out by the United States Supreme Court in *SEC v. W. J. Howey Co.*, 328 U. S. 293 (66 SC 1100, 90 LE 1244) (1946), and "refined" in later decisions. *Dunwoody Country Club*, 243 Ga. at 239. That test provides that an instrument is a security if it is (1) "an investment in a common venture"; (2) "premised on a reasonable expectation of profits"; (3) "to be derived from the entrepreneurial or managerial efforts of others." (Punctuation omitted.) *Tech Resources v. Estate of Hubbard*, 246 Ga. 583, 584 (272 SE2d 314) (1980), quoting *United Housing Foundation v. Forman*, 421 U. S. 837, 852 (95 SC 2051, 44 LE2d 621) (1975).

Rasch concedes that the state proved that the instruments in this case met the first and third prongs of the *Howey* test, but asserts that there was no "reasonable expectation of profits" because the instruments all provided for a fixed rate of interest. He relies upon federal decisions to assert that such "interest" should not be equated with "profits." See, e.g., *American Bank &c. Co. v. Wallace*, 529 FSupp. 258 (E.D. Ky. 1981).

But both this Court and the Supreme Court of Georgia have held that promissory notes providing for the payment of interest can fall within the statutory definition of a security under Georgia's blue sky law. In one case, GFI Financial, Inc. sold promissory notes to a number of investors, "claim[ing] [that] its investment activities would yield returns of approximately 10 percent to 28 percent to purchasers of the notes." *Womack v. State of Ga.*, 270 Ga. 56, 57 (507 SE2d 425) (1998). GFI had no ability to generate income other than through the sale of these notes. Id. The Supreme Court had "no doubt" that these promissory notes met the definition of a security under the Georgia Securities Act. Id. at 57. The court noted that "GFI's notes had all of the characteristics of a security: They represented investments in a common scheme (in which the investor looked to the efforts of others for a return on his investment), not commercial transactions." Id. at 58 (1).

Rasch contends that *Womack* is distinguishable, however, because the notes in that case apparently promised a variable, not a fixed, rate of return. While the amount of interest promised in the individual notes is not clear from the *Womack* opinion, this Court has found that notes providing for a fixed rate of return also fall under the definition of a security. The defendant in *Mosley v. State*, 253 Ga. App. 710 (560 SE2d 305) (2002), gave promissory notes to four of his investment clients. To one client, he promised a fivefold return of her money within six months. The promissory note provided, however, that in the event that " 'the business transaction that this loan is securing does not materialize' " the client would receive the return of

her principal plus ten percent interest. Id. at 710. Another client received a note with similar terms.[3] Id. at 711. Thus, these notes provided a fixed rate of return of either five times the initial investment or ten percent interest. This Court concluded that these notes represented securities transactions rather than loans. Id. at 712-713.

We find no reason to distinguish the instruments in this case from the notes in *Mosley*. Although the investors in *Mosley* had two possibilities of return, in each case the amount of return was fixed. Here, there is no dispute that these instruments represented investments and that the investors relied upon Rasch to manage these investments for them and to provide a return on their investment. Even though the amount of expected return was fixed, we believe that the instruments sold by Rasch qualified as securities under our blue sky law. See also *Moss v. State*, 209 Ga. App. 486, 487 (1) (433 SE2d 692) (1993) (investment pool held to be a security where defendant guaranteed investor a 50 percent return in a notarized contract). Cf. *Bookhardt v. State*, 710 S2d 700, 701 (Fla. App. 1998) (court had "no hesitation" in finding unsecured promissory notes to be securities under Florida blue sky provision where defendant held himself out as financial adviser and offered investment opportunities with high rate of return); *Bayhi v. State*, 629 S2d 782, 787, n. 3 (Ala. App. 1993) (promissory notes guaranteeing 100 percent return held to be securities under the *Howey* test).

2. Rasch also asserts that the trial court erred in admitting charts prepared by the state's forensic auditor into evidence and in allowing them into the jury room in violation of the continuing witness rule.

> In Georgia, the continuing witness objection is based on the notion that written testimony is heard by the jury when read from the witness stand just as oral testimony is heard when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once.

*Tanner v. State*, 259 Ga. App. 94, 98 (3) (576 SE2d 71) (2003). The rule is usually applied to testimonial documentary evidence such as affidavits, depositions, written confessions, statements and dying declarations. Id. But this Court has held that "the continuing witness objection does not apply to items of evidence such as drawings or other documents which are demonstrative evidence that serve only to *illustrate* testimony given by the witnesses." (Punctuation and foot-

---

[3] The terms of the promissory notes for the remaining clients were not stated.

note omitted; emphasis in original.) *Perry v. Clay*, 250 Ga. App. 68, 69 (3) (550 SE2d 125) (2001). See also *Gabbard v. State*, 233 Ga. App. 122, 124 (3) (503 SE2d 347) (1998). We find the charts in this case were designed simply to illustrate the forensic auditor's testimony, and therefore no violation of the continuing witness rule occurred. Compare *Dept. of Transp. v. Benton*, 214 Ga. App. 221, 223 (2) (447 SE2d 159) (1994) (continuing witness violation found where expert's written calculations that went to the ultimate issue in the case went to the jury room).

Moreover, we note that the trial judge did not allow the charts to go into the jury room until after the jury specifically requested them. "It has been recognized for more than a hundred years that it is permissible for the trial judge, in his discretion, to permit the jury at their instigation to rehear requested parts of the evidence after they have retired and begun deliberations." (Citations and punctuation omitted.) *Williams v. State*, 208 Ga. App. 460, 461 (2) (431 SE2d 130) (1993).

3. Rasch also contends that there was insufficient evidence to support his conviction on the charges of securities fraud and theft by taking.

> On appeal from a criminal conviction, the evidence must be construed in the light most favorable to the verdict, and the appellant no longer enjoys a presumption of innocence. An appellate court determines only the legal sufficiency of the evidence adduced below and does not weigh the evidence or assess the credibility of the witnesses. To sustain the conviction, the evidence must be sufficient to authorize the jury's finding of the defendant's guilt of the crime charged beyond a reasonable doubt.

(Footnote omitted.) *Collins v. State*, 258 Ga. App. 400 (574 SE2d 423) (2002).

(a) *Securities Fraud (Counts 5-18)*. Rasch contends that the state failed to prove that he made any false representations to any of the victims in this case, and thus the state failed to prove "a device, scheme, or artifice to defraud" as required by OCGA § 10-5-12 (a) (2). That section provides that it is unlawful for any person:

> (2) In connection with an offer to sell, sale, offer to purchase, or purchase of any security, directly or indirectly: (A) To employ a device, scheme, or artifice to defraud; (B) To make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are

made, not misleading; or (C) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon a person.

OCGA § 10-5-12 (a) (2).

Here, the indictment charged Rasch in Counts 5 to 18 of committing securities fraud by selling securities "upon the representation that said money would be invested on [the victims'] behalf, which representation was untrue and which constituted a device, scheme, and artifice to defraud and thereby engaged in an act, practice and course of business that operated as a fraud and deceit on the purchaser. . . ." So the statute appears to provide alternate bases for proving securities fraud, the indictment alleges that the fraud in this case related to a misrepresentation. Therefore, pretermitting the issue of whether the state could have proved a "device, scheme, or artifice to defraud" in some other manner under the facts of this case, the indictment required proof that the securities were sold upon Rasch's misrepresentation that he would be investing the victims' funds on their behalf. And the trial judge charged the jury that proof of the false statement, made with intent to defraud, was sufficient "whether fraud resulted or not."

The securities fraud counts related to the transactions with Sisk, Davis, Schmitt and Marshall, and thus the state was required to prove that each of these individuals purchased securities based upon Rasch's misrepresentation.

The charge involving Sisk related to her November 1995 purchase of a factoring agreement for $15,000. She testified that Rasch told her he would be investing the money in a company. But the evidence at trial showed, and Rasch did not deny, that he actually used the money to buy a car. Rasch admitted that he wrote a check for the car at a time when his bank account did not have sufficient funds to cover the purchase, and that he subsequently sold the factoring agreement to Sisk.

Marshall testified that Rasch told him that he was planning to use his money to purchase sales receipts, and, in fact, the agreement Marshall signed provided that the invoices purchased would serve as collateral. But the state presented evidence that Marshall's money was used, along with other deposits, to cover his personal and operating expenses and to pay back other investors.

Although Davis was deceased at the time of trial, the evidence showed that Rasch referred to her transactions as "investments" when he later discussed the matter with the attorney for the executor of her estate. While that evidence standing alone is not sufficient to demonstrate what representations Rasch made to Davis herself, the first "Private Placement — Commercial Note" she signed con-

tains the representation that he would be using her funds to purchase supplies which would be held as collateral. But the state presented evidence that Rasch used Davis's principal to cover his own business expenses, to pay interest payments to Davis herself, and to pay other investors. The other note Davis signed contains no representation as to how her funds would be used.

We find that this evidence was sufficient for the jury to find beyond a reasonable doubt that Rasch committed securities fraud in connection with the Sisk, Marshall and the first Davis sales (Counts 5, 6 and 18). *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

But we find that the evidence was insufficient to support a conviction on the remaining securities fraud counts, involving the second sale to Davis (Count 7) and the Schmitt transactions (Counts 8-17). The second note Davis signed is silent as to how the funds would be used, and the state presented no other evidence showing what representations were made to her in connection with that transaction. Similarly, Schmitt was incapacitated at the time of trial, and none of the witnesses presented by the state could testify as to what Rasch represented to her in connection with her numerous "factoring agreements," and the agreements themselves do not contain any representations as to how the funds would be used. Therefore, the state failed to present any evidence of misrepresentations made by Rasch with regard to these transactions and thus failed to prove securities fraud as alleged in the indictment for Counts 7 through 17. Accordingly, Rasch's conviction on those counts is reversed.

(b) *Theft by Taking (Counts 19-20)*. Rasch also asserts that the evidence was insufficient to support his convictions for theft by taking. Those counts stem from his transactions with Schmitt and Alexander and from the November 1995 transaction with Sisk. Rasch contends that because these transactions were evidenced by agreements in which he promised to repay the funds and because he has never denied owing these individuals the money, he cannot be convicted of theft. We disagree.

"A person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." OCGA § 16-8-2. As previously discussed, the evidence showed that Rasch took Sisk's $15,000 in November 1995 with the intention of buying a car, and not with the intention of investing it as he represented to her. At the time he sold Sisk the factoring agreement, he had approximately $40 in the bank account on which he wrote the check for his car, a substantial amount of debt and no immediate prospects of repaying the money within the 90 days pro-

vided for in the note. Moreover, approximately nine months after the investment was made, Rasch presented Sisk with a check to reimburse her that was dishonored, and the account on which it was written was later closed. Under these circumstances, we find that the evidence was sufficient to support Rasch's conviction of theft by taking in connection with that transaction. See generally *McMahon v. State*, 258 Ga. App. 512, 514-515 (1) (574 SE2d 548) (2002); *Tukes v. State*, 250 Ga. App. 117, 120-121 (1) (b) (i) (550 SE2d 678) (2001).

In connection with Schmitt and Alexander, there was evidence that Schmitt was 80 years old when she moved back to Georgia and that she was suffering from mental confusion. Alexander was retired and had various health problems. The evidence showed that Rasch was using the money from Schmitt and Alexander, over $226,000, to cover his own operating expenses and to pay back the other investors. The evidence also showed that Rasch deposited $40,000 of Alexander's money into his own account three days after Alexander's death. Moreover, Rasch was using Schmitt's money to cover his own expenses at a time when he held power of attorney for her.

While this evidence is circumstantial, "[t]his case involves a crime of deception and abuse of trust. The evidence presented is circumstantial by necessity." *Urness v. State*, 251 Ga. App. 401, 403 (2) (554 SE2d 546) (2001). In addition to the evidence noted above, the state presented evidence showing a pattern of misrepresentation and that Rasch was operating a Ponzi scheme involving deceit in his dealings with his "investors." We find that the evidence, when viewed as a whole, was sufficient to support Rasch's conviction on this charge.

> The evidence was all circumstantial. . . . But when added together, as a whole it is sufficient to warrant a conviction, and it excludes every other reasonable hypothesis save that of guilt of the accused. In such cases it is not necessary that the circumstances remove every possibility of the defendant's innocence.

*Champion v. State*, 260 Ga. App. 12, 14 (1) (579 SE2d 35) (2003).

*Judgment affirmed in part and reversed in part. Ruffin, P. J., and Barnes, J., concur.*

DECIDED MARCH 19, 2003.

Colin A. Fieman, Debra M. Finch, for appellant.

Kenneth W. Mauldin, District Attorney, John A. Pursley, Assistant District Attorney, Thurbert E. Baker, Attorney General, Michael

*E. Hobbs, Deputy Attorney General, Kimberly L. Schwartz, Assistant Attorney General*, for appellee.