### A00A1166. LEGG v. STOVALL TIRE & MARINE, INC.
(538 SE2d 489)

RUFFIN, Judge.

Stovall Tire & Marine, Inc. (Stovall Marine) sued Robert Legg for a commission Legg allegedly owed under a brokerage contract. Rejecting Legg's argument that no valid contract existed between the parties, the trial court granted summary judgment to Stovall Marine. Legg appeals, and we reverse because genuine issues of material fact preclude summary judgment.

Construing the facts and all inferences therefrom most favorably to Legg,[1] the record shows that, in February 1997, Legg contacted Jon Stovall, a sales representative at Stovall Marine, and asked for help in selling his boat. Stovall told Legg that he thought the boat could be sold for $91,500, and he faxed Legg one of Stovall Marine's

---

[1] In ruling on a motion for summary judgment, the court should give the nonmoving party the benefit of all reasonable doubt and should construe the evidence and all inferences and conclusions therefrom most favorably toward the nonmoving party. *McDuffie v. Argroves,* 230 Ga. App. 723, 724 (1) (497 SE2d 5) (1998).

standard brokerage agreements.

The agreement provided that Legg would place the boat "on consignment" with Stovall Marine for a period of 90 days and that, if Stovall Marine sold the boat, it would pay Legg $91,500. Paragraph Five of the agreement stated that Stovall Marine would receive a 15 percent commission if Legg sold the boat during the 90 day period without Stovall Marine's help: "During the consignment period stated above Stovall Tire & Marine, Inc. is rendering a valuable service and shall receive 15% of the gross sales price as commission if the sale is originated from parties other than Stovall." The agreement contained a blank space for the signature of the owner (Legg), as well as blank spaces for "Mgr. Approval" and "Listing Agent." Legg crossed through Paragraph Five of the agreement, then signed it and returned it to Stovall Marine. No one from Stovall Marine ever signed the agreement.

According to Legg, he spoke with Jon Stovall approximately two weeks later, and Stovall told him that Stovall Marine would not honor the agreement because "the price was too high and the agreement had not been accepted or signed by his manager, and the agreement was not binding until it had been both accepted and signed by his manager." Legg therefore placed the boat for sale at another company, Holiday Marina.

Legg received no offers for the boat, so in May 1997 he called Jon Stovall back to negotiate a new agreement. Stovall said that Stovall Marine would accept Legg's boat and would give Legg $83,500 if Stovall Marine sold it. He faxed Legg a new standard brokerage agreement which was identical to the previous one, except for the date and amount to be paid to Legg upon sale. Legg signed the new agreement and returned it to Stovall Marine. This time, Legg did not cross out Paragraph Five. However, no one from Stovall Marine ever signed the new agreement.

After signing and returning the second agreement, Legg took his boat to Stovall Marine, which cleaned and repaired it. Several days after Legg brought in the boat, he received a call from David Lyle, who said he had seen the boat at Holiday Marina and was interested in buying it. According to Legg,

> I immediately contacted [Jon Stovall] to let him know that I had a potential buyer who had seen the boat before my renewed discussions with Stovall Marine, and that . . . I would pursue the sale, until such time as I received a copy of the agreement, signed by a manager at Stovall Marine, showing Stovall Marine's acceptance of the agreement.

But Legg never received a copy of the second agreement signed by

anyone at Stovall Marine, and neither Stovall nor anyone else ever told him that Stovall Marine had accepted the second agreement.

Lyle agreed to buy the boat from Legg, who instructed Stovall Marine to release it. Stovall Marine then demanded that Legg pay it 15 percent of the sales price pursuant to Paragraph Five of the second agreement. When Legg refused, Stovall Marine sued him for breach of contract. Stovall Marine moved for summary judgment, and the trial court granted the motion without explanation.

Legg argues that genuine issues of fact remain as to whether a valid contract existed between the parties. Specifically, Legg contends that there is evidence that Stovall Marine never assented to the second agreement. We agree.

A binding contract exists only where both parties have assented to all the terms.[2] In determining whether there was a mutual assent,

> courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent.[3]

In some cases, the only evidence of the parties' intent is the express language of the contract. But in other cases, such as this one, "the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement."[4] Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.[5]

Although no one from Stovall Marine ever signed the May agreement, "[a]ssent to the terms of a contract may be given other than by signatures."[6] Stovall Marine contends that it indicated its assent to the agreement by accepting, cleaning, and repairing Legg's boat. Legg, however, argues that the course of dealing between the parties shows that Stovall Marine never assented to the agreement. Accord-

---

[2] OCGA §§ 13-3-1; 13-3-2.

[3] *Cox Broadcasting Corp. v. Nat. Collegiate Athletic Assn.*, 250 Ga. 391, 395 (297 SE2d 733) (1982).

[4] Id.

[5] See, e.g., *Danfair Properties v. Bowen*, 222 Ga. App. 425, 426 (474 SE2d 295) (1996) (fact that defendant contested whether there was "meeting of the minds" on material contract term "required that the issue be presented to the jury"); *Re/Max Specialists v. Kosakai*, 202 Ga. App. 871, 872 (415 SE2d 698) (1992) (summary judgment inappropriate where "[t]he issue of whether a valid written contract existed is crucial to the resolution of this case and the evidence is in total conflict as to whether the writing in issue is such a contract").

[6] *Cochran v. Eason*, 227 Ga. 316, 318 (1) (180 SE2d 702) (1971).

ing to Legg, Jon Stovall told him that the first agreement, which Legg signed and returned in February, was not binding because it had not been "both accepted and signed by his manager."[7] In addition, Stovall testified during his deposition that a manager's approval is required for acceptance of a brokerage agreement. The fact that there were signature blocks in the agreement for the Stovall Marine listing agent and manager approval also tends to show that the agreement was not intended to be binding until it was signed by Stovall Marine.

Legg maintains that after Lyle contacted him about the boat, Legg called Stovall and told him that he would pursue the sale until he received a copy of the May agreement signed by a manager at Stovall Marine indicating acceptance of the agreement. It is undisputed that no one from Stovall Marine ever signed the second agreement. From this evidence, a jury could conclude that Stovall Marine had not, in fact, accepted the May agreement and that no contract existed between the parties. In light of this disputation of fact, summary judgment was inappropriate.[8]

*Judgment reversed. Andrews, P. J., and Ellington, J., concur.*

DECIDED AUGUST 18, 2000.

*Merritt & Tenney, David E. Spalten, Leon P. Hudgins*, for appellant.

*Albert B. Wallace, Stephen B. Wallace II, Thomas J. Smith, Jr.*, for appellee.

---

[7] Stovall Marine argues that the February agreement that Legg signed and returned to Stovall Marine was a counteroffer because Legg struck through Paragraph Five. Thus, Stovall Marine argues that Jon Stovall's alleged statement that a manager's approval was required to make the agreement binding only shows that managerial approval is needed to accept a *counteroffer*, not to indicate assent to a contract. This is hypertechnical. Assuming Legg is telling the truth, the question is whether a reasonable person in Legg's position could have believed from Stovall's alleged statement that managerial approval was required to indicate assent, and the answer to that question is yes.

[8] See *Century 21 Pinetree Properties v. Cason*, 220 Ga. App. 355, 356 (2) (a) (469 SE2d 458) (1996) (reversing grant of summary judgment where there were "genuine issues of material fact as to whether Century 21 is a party to the contract even though it did not sign the document").