**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER, and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 16, 2013**

# In the Court of Appeals of Georgia

A13A0736. CUSHING v. COHEN et al.

A13A0820. SCHEINFELD et al. v. CUSHING.

BARNES, Presiding Judge.

These two cases involve different plaintiffs and opposing trial court rulings but the same defendants and the same three financial instruments. The issue in both appeals is whether these instruments were securities under Georgia law or simply investments in a common venture. The plaintiffs contend that the investments were unregistered securities and that they are entitled to the return of the money they invested. The defendants contend that the investments were simply real estate development loans for which the plaintiffs must bear the loss. For the reasons that follow, we conclude that the financial instruments at issue here are securities under the Georgia Securities Act of 1973, OCGA § 10-5-1 et seq.

The plaintiffs in both of these cases sued attorney Charles M. Cushing, Palmetto Capital Corporation, and Mary Alice Ruben, as the executor of James Ruben's estate, as trustee and beneficiary of the James Ruben Jr. Trust, and individually. They alleged that the financial instruments they purchased that were related to three real estate development loans were unregistered securities, and sought the return of their investments.

In Case No. A13A0736, the trial judge determined that the financial instruments were securities under the Georgia Securities Act of 1973. Cushing appeals the trial judge's grant of summary judgment to the plaintiffs on the securities issue and other rulings related to the statute of limitations, tolling, release, breach of fiduciary duty, and derivative claims. In Case No. A13A0820, a different trial judge held that the financial instruments were not securities but simply commercial loans. Those plaintiffs appeal the trial court's grant of summary judgment to Cushing on the securities issue.

"On appeal from the grant or denial of a motion for summary judgment, we conduct a de novo review of the law and evidence, viewing the evidence in the light most favorable to the nonmovant, to determine whether a genuine issue of material fact exists and whether the moving party was entitled to judgment as a matter of law."

(Citation omitted.) *Golden Atlanta Site Dev. v. Tilson*, 299 Ga. App. 646, 649 (2) (683 SE2d 166) (2009).

So viewed, the record establishes that in the 1990s, James Ruben began putting together real estate development loans that were made up of contributions from a number of people. Initially the borrowers issued promissory notes and security deeds that named every investor, but as the deals became larger with more investors, Ruben hired the law firm of Cushing and Morris to incorporate Palmetto Capital Corporation in 1993. Ruben could then have the borrowers issue the notes and deeds to Palmetto, and when the loan was paid off Ruben would not have to obtain each investor's signature to cancel the deeds to secure debt.

James Ruben, Charles Cushing, and another attorney at the firm were the original three shareholders, but Cushing and the other attorney sold their interest in the corporation to Mary Alice Ruben in August 1998. Cushing was Palmetto's secretary and registered agent from 2003 to 2008. The corporation minutes reflect that Palmetto's board of directors repeatedly authorized Cushing in his capacity "as general counsel, vice-president of the Corporation" to execute documents necessary to complete transactions. In June 2003, Cushing executed an "incumbency certificate"

verifying his title and other corporate documentation for the benefit of a real estate buyer and title company.

Ruben reviewed 20 to 40 investment deals before finding one "he would even think twice about." When Ruben found a deal he was interested in, he asked some of his more sophisticated investors to look at the property and perform other due diligence, for which they received a fee.[1] Ruben would then talk to the potential borrower, and if they reached an agreement, Ruben emailed details of the proposal to his list of investors and invited them to participate. His messages would include details about the property that would secure the loan, the identity of the borrower, and the terms of the loan.

Once Ruben had a sufficient number of subscribers to meet his monetary goal, he would direct them to send their investment to the law firm, which held the funds in escrow, prepared the closing documentation, then closed the deal. The borrowers gave Palmetto promissory notes and security deeds to the real property purchased with the loans, and Palmetto in turn issued unsecured promissory notes to the

---

[1]Ruben was diagnosed with ALS in 1995 and became progressively disabled physically until his death in 2007. He thus relied on other people to research some aspects of the deals he identified as interesting.

4

investors. Ruben received up to three percent of the total loan for putting the deals together and Palmetto received one percent for servicing the loans.

The developers generally made monthly interest-only payments to Palmetto for two or three years and then repaid the principle in a balloon payment. Palmetto paid the investors their proportionate share of the monthly payments and sent the investors monthly email updates about the projects. The investors received their principle back when the developers made a balloon payment at the end of the loan period.

In 2003, a financial advisor for one of the investors asked Ruben whether the promissory notes were actually securities. In response to questions from Ruben, Cushing hired an expert in securities law to obtain a legal opinion about whether these investments were securities under state and federal law. The expert concluded that it was "highly likely that a court would deems these loan participations to be securities." He further opined that, because Ruben was a corporate officer, his transactions were illegal because he was paying himself commissions but was not registered as a securities dealer or salesperson under OCGA § 10-5-2 (25).

In response to the expert's opinion that these financial transactions were securities, Ruben advised Cushing that he would not make any more loans until the security issue was settled and asked what Palmetto could do to become compliant

5

with securities laws. Cushing prepared a "Securities Analysis" memo, advising Ruben that, while Palmetto could seek to qualify for a "private placement" exemption from securities laws, the fees the investors paid to Palmetto might affect the company's ability to qualify for such an exemption. He also advised Ruben that the fees he and Palmetto received would "run afoul" of the registration requirements for a securities salesperson and broker, concluding that the structure of the deals presented insurmountable problems in any attempt to obtain an exemption from securities registration requirements. Cushing recommended that Ruben leave the structure "as is" and rely on the two-year statute of limitation as protection against future securities claims.

In 2004, Palmetto began what Ruben called a "leverage[d] lending program," pooling investors' money with money Palmetto borrowed directly from a commercial bank. Palmetto then loaned the pooled money to high-risk developers at an interest rate higher than the bank's rate. The difference between the interest the developers paid Palmetto and the interest Palmetto paid to the bank – the "spread" – allowed Palmetto to deliver high returns to the investors.

Palmetto made three loans which are at issue here, combining $14,900,000 from 141 individual investors with $25,138,000 from Nexity Bank to finance the

loans through a shell corporation. The Riverside loan for $20,488,000 ($4,358,900 of which was from investors) closed in April 2005, the Bartow loan for $3,050,000 ($1,600,000 from investors) closed in March 2006, and the Fairburn loan for $16,500,000 ($8,250,000 from investors) closed in July 2006.

For each project, the developer gave Palmetto a single promissory note and a deed to secure the debt, and Palmetto entered into a "secured participation agreement" with the bank, giving the bank a first priority perfected security interest in the deed to secure debt and in the loan proceeds that the developers paid Palmetto. Palmetto gave each investor a promissory note confirming his or her percentage of the total loan.

Rather than telling the investors that Palmetto had borrowed the money from the bank and the developers had borrowed money from Palmetto, Palmetto misinformed the investors. Palmetto told them that the bank had made direct loans to the developers, secured by first-priority security deeds, and that Palmetto had separately loaned the investors' money to the developers, secured by second priority deeds. Mary Alice Ruben testified that James Ruben did not tell the investors about the existence of Palmetto's secured participation agreement with Nexity Bank because he thought the investors "did not understand participation agreements."

James Ruben died in March 2007. All three developers defaulted on their loans in 2007, which caused Palmetto to default on the payments due to the investors. Palmetto and some of the plaintiffs in Case No. A13A0736 entered into tolling agreements and some of those plaintiffs released some of their claims, although whether they released only the bank or the bank and the other defendants is disputed. One suit was filed by seven members of the Cohen family, both minors and adults.[2] The other suit was filed by an individual, a corporation, and a trustee,[3] all of which were closely involved in multiple real estate transactions with Palmetto for many years.

In Case No. A13A0736, the trial judge granted summary judgment to the minor plaintiffs on all three notes on the issue of whether the notes were securities, granted summary judgment to the adult Cohens on one note, and granted summary judgment to Cushing as to the adult Cohens on the other two notes based on the running of the

---

[2]The plaintiffs in A13A0736 are Dorothy Cohen, Sheldon Cohen, Steven Cohen, Andrea Cohen, Steven Cohen as guardian and trustee for the Simon Cohen Trust, Steven Cohen as guardian and trustee for the Naomi Lillian Cohen Trust, and Steven Cohen as guardian and trustee for the Ari Benjamin Cohen Trust.

[3]The plaintiffs in A13A0820 are Mark A. Scheinfeld, B.G. Capital, LLC, and Frank B. McGowan Properties PST.

statute of limitation. The trial judge in Case No. A13A0820 granted summary judgment to Cushing on the securities issue.

Case No. A13A0736

In this case, the trial court granted summary judgment to the minor Cohens on their claim for rescission of the all three notes, to the adult Cohens on their claim for rescission of the Fairburn note, and to one of the adult Cohens on claims related to a supplemental investment. The court also granted the plaintiffs summary judgment on Cushing's counterclaim seeking to enforce a release and covenant not to sue and attorney fees. Finally, the court granted summary judgment to Cushing on the adult Cohens' claims for rescission of the Riverside and Bartow Notes on statute of limitation grounds.

Cushing appeals the trial court's order concluding that the financial instruments Palmetto issued to the Cohens were securities. Cushing argues that the trial court erred in (1) finding that the notes were securities and that he was strictly liable for their sale; (2) finding that the statute of limitations had not expired on all of the securities claims; (3) finding that OCGA § 9-3-61 tolled the adult Cohens' claims related to Cushing's role as an executive in Palmetto; (4) finding that a release and covenant not to sue did not apply to claims against Cushing; (5) denying his motion

9

for summary judgment on the Cohens' breach of fiduciary duty claim; and (6) denying his motion for summary judgment on the Cohens' claims seeking an accounting and a constructive trust.

1. Cushing contends that the trial court erred in finding that the notes at issue in this case were securities under Georgia law and that he was strictly liable for their sale as Palmetto's officer.

The Georgia Securities Act of 1973[4] did not comprehensively define the term investment contract. The Act defined the term "security" to include

> any note, . . . evidence of indebtedness, certificate of indebtedness, investment certificate, certificate of interest or participation in any profit-sharing agreement, . . . or beneficial interest in profits or earnings, or any other instrument commonly known as a security. . . .

Former OCGA § 10-5-2 (26) (2007). In applying the Securities Act, the Supreme Court of Georgia adopted the definition adopted by federal courts applying federal securities laws, originally articulated in *Securities & Exchange Comm. v. W. J. Howey*

---

[4]OCGA § 10-5-1 et seq. (2007). Note: Effective July 1, 2009, the Georgia Securities Act of 1973 was repealed in its entirety and replaced with the Georgia Uniform Securities Act of 2008. See Ga. L. 2008, p. 381, §§ 1, 10. The 2008 Act provides that the predecessor Act governs all actions based on conduct occurring before July 1, 2009. OCGA § 10-5-90 (a) (2013).

*Co.*, 328 U. S. 293 (66 SCt 1100, 90 LE 1244) (1946). Factors that distinguish securities from other financial instruments are (a) an investment in a common venture with (b) a reasonable expectation of profits from the entrepreneurial or managerial efforts of someone else. *Dunwoody Country Club v. Fortson*, 243 Ga. 236, 239 (253 SE2d 700) (1979).

(a) Cushing argues that the plaintiffs did not invest in a common enterprise, but simply participated in making commercial real estate loans. These underlying loans, Cushing contends, were "a superficial pooling of funds, not an extensive scheme to operate a new joint venture." The plaintiffs did not receive an undivided interest in a pool of loans, Cushing argues, but rather purchased participation in specific loans.

"[T]he label placed on the instrument by the parties or by the courts does not determine whether the instrument is a security. Instead, the characteristics of the instrument and the underlying economic reality are the significant factors for a court to consider in classifying an instrument as a security." *Dunwoody Country Club v. Fortson*, 243 Ga. at 238. Further, "promissory notes providing for the payment of interest can fall within the statutory definition of a security under Georgia's blue sky law." *Rasch v. State*, 260 Ga. App. 379, 384 (579 SE2d 817) (2003). Even notes providing for a fixed rate of return may fall under the definition of security. Id.

11

In this case, the funds pooled from the investors in these three commercial ventures had to reach "minimum amounts for participation," which indicates an investment in a common enterprise. *Hicks v. State*, 315 Ga. App. 779, 783 (1) (728 SE2d 294) (2012). Further,

> [T]he terms of the offer explicitly state that investors' funds will be pooled and apportioned proportionately by Appellants to each account. This language clearly presents an offer for an investment in a common enterprise and thus supports the common enterprise prong of the *Howey* test.

*SEC v. Unique Financial Concepts*, 196 F3d 1195, 1200-1201 (1) (11th Cir. 1999).

(b) Cushing then argues that the transactions here do not meet the element of reasonable expectations of profit derived solely from the managerial efforts of others because the plaintiffs' returns were based solely on the borrower's ability to repay the loans, and Palmetto simply serviced the loans. He contends that the investors had no prospect of capital appreciation, did not participate in the borrower's earnings, and made independent assessments of the transactions instead of relying on Palmetto's representations.

The policy behind the investments element requiring that profit be derived from the entrepreneurial or managerial efforts of others "is to protect the investor with the

shield of the securities laws when the promoter or syndicator puts forth the essential managerial efforts which affect the failure or success of the enterprise." (Citations and punctuation omitted.) *Huggins v. Chapin*, 227 Ga. App. 340, 342 (489 SE2d 109) (1997). We focus our inquiry "on what the purchasers were offered or promised," and objectively inquire into the character of the transactions "based on what the purchasers were led to expect." (Citations and punctuation omitted.) *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009). "Accordingly, courts have frequently examined the promotional materials associated with an instrument or transaction in determining whether an investment contract is present." Id.

Here, the record shows that Palmetto marketed these products by touting its skills in selecting the deals and in managing them afterward. In its email messages to potential investors, Palmetto represented, for example, that one of its deals had a "98% chance of full payment" with only a "2% chance of default." Ruben said he analyzed "twenty to forty" potential deals before he found one to present to investors and scrutinized each deal in an "11-step due diligence" process. Investors could expect profits with no risk, Palmetto claimed, because of its expertise in picking valuable collateral property and making "leverage[d] lending transactions" that "no one else in America" did. In his email to potential investors about the Riverside deal,

James Ruben said "the return is close to those flying their product over the Everglades, tonight, 200 feet above the tress with no lights" (presumably a reference to drug smugglers).

James Ruben told investors that he and Mary Alice Ruben were fiduciaries. He continued, "Most of our investors don't have a clue about what we do. They trust us and we have produced for 22 years." Palmetto described the notes as profitable investments, not as loans, and assured the potential investors that if the developer defaulted, Palmetto would either buy out the investors at a profit, buy the bank's interest and sell the property for cash at a profit, or use the property as collateral for another leveraged transaction. It even told investors that the best thing that could happen would be for the builder to default because then they would make even higher profits. Ruben assured investors that if they ever felt "anything but very happy, [they] could be bought out with 20% interest" or they could obtain $7,500 for every $5,000 originally invested."

The evidence shows that the investors expected their profit from these financial transactions to be obtained through Palmetto's managerial efforts. The leveraged lending that combined the investors' money with the bank's money to generate a high rate of return was not a straightforward pass-through loan. The profits would be based

14

on Ruben's skill in selecting the deals in the first place, managing the loans as time went on, and salvaging the capital if the borrowers defaulted. These investments thus meet the definition of security. See *Rasch v. State*, 260 Ga. App. at 384-385 (1) (promissory notes providing for fixed rate of interest from management efforts of seller met definition of security); *Mosely v. State*, 253 Ga. App. 710, 712-713 (1) (560 SE2d 305) (2002) (same); *Moss v. State*, 209 Ga. App. 486, 487 (433 SE2d 692) (1993) (same). [5]

(c) Cushing further argues that the trial court erred in finding him jointly and severally liable for the sale of unregistered securities because he was just the closing attorney on the transactions. He contends that he was designated as Palmetto's vice president and general counsel "merely so that he could sign corporate documents for Palmetto" because principal owner Ruben was physically limited. But records from the Secretary of State establish that Cushing was the corporate secretary of Palmetto during these transactions. While Cushing contends that he had no duties or responsibilities as the corporate secretary, under former OCGA § 10-5-14 (c), every

---

[5] Georgia's Acting Assistant Commissioner for Securities has filed amicus briefs voicing the Secretary of State's position that the investments at issue constitute securities.

15

executive officer of an entity that sells unregistered securities is liable jointly and severally.

For all of these reasons, we conclude that the trial court did not err in holding that the notes at issue in this case were securities under Georgia law.

2. Cushing argues that the trial court erred in finding that the statute of limitations had not expired on the adult Cohens' claims related to the Fairburn note.[6] On July 11, 2008, the parties signed an agreement to toll the running of the statute of limitations until September 2008 or suit was filed, whichever came first. The original Cherokee County action against these defendants was filed on July 25, 2008, within the time allowed by that agreement, and this renewal action was filed within six months of the original action's dismissal.[7]

Cushing argues, however, that the parties entered into the Fairburn deal more than two years before July 11, 2006, the date of the tolling agreement, and therefore the statute of limitation as to claims related to that deal expired before the original complaint was filed. He asserts that the contract was created on the date the Cohens

---

[6]Cushing concedes that the statute of limitation is tolled as to the minor Cohens' claims until they reach the age of majority.

[7]The original action included all of the plaintiffs in both of these appeals.

16

agreed to the terms outlined in Palmetto's offer, either by failing to respond to Palmetto's offer to buy them out of a previous loan that was rolled over into the Fairburn note, when they sent email agreeing to invest in the deal, or when they sent money to the law firm to be held in escrow until the closing, all of which occurred more than two years before the parties reached the tolling agreement.

The trial court agreed with Cushing that the adult Cohens' claims regarding the Riverside and Bartow notes were time-barred, and by implication held that claims regarding the Fairburn note and one plaintiff's supplemental investment were not. The court noted that the developer's loan had to close before the material terms of the investors' notes could be fixed. The Fairburn developer's loan closed on July 13, 2006, and therefore the statute of limitation would have run two years after that.

"A binding contract exists only where both parties have assented to all the terms. OCGA § § 13-3-1, 13-3-2." *Legg v. Stovall Tire & Marine, Inc.*, 245 Ga. App. 594, 596 (538 SE2d 489) (2000). Email from Palmetto to potential investors about a specific deal asked them to respond if they were interested and Palmetto would tell them how much to send to the law firm, but the amount they wanted to invest could change depending on the size of the loan. Palmetto reserved the right to materially alter the terms of the loan up to the date of closing. Investors could back out at any

17

time until the closing, and their checks were not deposited into the law firm's escrow account until the day before the closing, July 12, 2006. Mary Alice Ruben testified that the date of each deal was the date of the closing.

Because the terms of the Fairburn note were not set until the developer's loan closed on July 13, 2006, and the parties tolled the running of the statute beginning July 11, 2008, the trial court did not err in denying Cushing's motion for summary judgment against the adult Cohens' Fairburn claims on this ground.

3. Cushing also argues that the statute of limitation bars the Cohens' claims against him based on his role as an executive officer of Palmetto because those claims were not asserted in the original complaint, and that the trial court erred in finding that the renewal statute, OCGA § 9-3-61, tolled the limitation period on those claims.

To stand on the same footing as the original action with respect to the statute of limitation, the cause of action must be substantially the same. *Burns v. Dees*, 252 Ga. App. 598, 608 (1) (d) (557 SE2d 32) (2001); OCGA § 9-2-61 (a). In the original action, the plaintiffs asserted that Cushing was named an officer in Palmetto when it was formed in 1993 and that he and Ruben operated and controlled Palmetto as active officers of the corporation. In Count IV, the plaintiffs claimed that "Defendants were fiduciaries in various relationships and capacities with the Plaintiffs in all of the

18

transactions. . . ." In Count XI, the plaintiffs alleged that the defendants were not authorized to sell securities, that these three transactions were unregistered securities, and that the defendants' failure to register the securities as required by Georgia law made the transactions voidable and entitled the plaintiffs to a full refund of their investment.

In the renewed complaint, the plaintiffs again claimed that Cushing was made an officer in Palmetto in 1993, that Palmetto through its officers offered investments opportunities, that neither Palmetto nor its officers were authorized to sell securities, that the financial instruments at issue here were unregistered securities, and that Palmetto's executive officers were liable for the return of the money plaintiffs paid for these investments.

While a plaintiff's substantial rights or a defendant's liability cannot be enlarged in a renewal action, the renewal action need not be identical to the first one. *Bertone v. Wilkinson*, 213 Ga. App. 255, 256 (444 SE2d 576) (1994). The trial court found that the claims in this renewed action were sufficiently similar to the original claims so that the statute of limitation was tolled under the renewal statute, OCGA § 9-3-61 (a), and we find no error in this conclusion.

4. Cushing contends that the trial court erred in concluding that none of the plaintiffs released their claims against him related to the Fairburn and Bartow deals. After those loans went into default, Nexity Bank and Palmetto entered into a Restated Participation Agreement, in which Nexity released Palmetto from certain obligations in exchange for a release from the investors (the "Releasing Parties"). The Releasing Parties agreed to release "Nexity and all of Nexity's subsidiaries, affiliates, and participants, and all of Nexity's and its subsidiaries', affiliates' and participants' respective past, present and future officers, directors, employees, agents, representatives, attorneys, loan servicers, asset managers, heirs, successors and assigns" from any claims arising from these two loans or that could have been asserted in the original Cherokee County complaint.

Cushing argues that: (1) the Releasing Parties executed the release of Nexity's participants, agents, and attorneys from all causes of action, "as contemplated by the Restated Participation Agreement"; (2) the Restated Participation Agreement defines Palmetto as a "participant" of Nexity; (3) Cushing was Palmetto's attorney; and therefore (4) he was released from any cause of action by the three Cohens who signed the release.

Former "OCGA § 24-6-3(a) authorized the use of contemporaneously executed writings to provide necessary terms not contained in the document at issue." See *White House Inn & Suites v. City of Warm Springs*, 285 Ga. 322, 323 (1) (676 SE2d 178) (2009). A provision in the contemporaneously executed "Consents to the Restated Participation Agreement" between Palmetto and Nexity Bank expressly reserve the investors' right to assert claims against Palmetto, its officers, directors, attorneys, or other agents. Mary Alice Ruben confirmed in her deposition that these documents were not intended to release her or Palmetto, which was also the understanding of Sheldon Cohen, who signed the releases on behalf of himself, his wife and his daughter. He received email from an attorney representing Palmetto at that time which confirmed his understanding that he was not releasing Cushing. Considering the uncontroverted evidence of record, the trial court did not err in finding that the plaintiffs did not release any claims against Cushing.

5. Cushing contends that the trial court erred in denying his motion for summary judgment on the plaintiffs' claims for breach of fiduciary duty, arguing that he owed no such duty to the plaintiffs. The trial court denied the motion, finding that genuine issues of material fact exist regarding the existence of a fiduciary relationship between plaintiffs and Palmetto and Cushing as Palmetto's Secretary, Vice President,

and General Counsel, and if such a duty exists, whether it was breached and the breach caused damages.

OCGA § 23-2-58 defines a fiduciary or confidential relationship as one "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith." "[A] confidential relationship may exist between business [people], depending on the facts." *Cochran v. Murrah*, 235 Ga. 304, 307 (219 SE2d 421) (1975). For example, a stockbroker may owe a limited fiduciary duty to non-discretionary customers and a heightened duty when recommending an investment in which he has a financial interest. *Holmes v. Grubman*, 286 Ga. 636, 643 (3) (691 SE2d 196) (2010).

Parties who join together as partners, promoters, joint venturers, or otherwise to achieve a common business objective may owe each other a fiduciary duty. *Vitner v. Funk*, 182 Ga. App. 39, 42-43 (2) (354 SE2d 666) (1987). Additionally, an officer of a corporation who participates or cooperates in a tortious act may be personally liable for resulting damages. *Jennings v. Smith*, 226 Ga. App. 765, 766 (1) (487 SE2d 362) (1997).

When a fiduciary or confidential relationship is not created by law or contract, we must examine the facts of a particular case to determine if such a relationship exists. Because a confidential relationship may be found whenever one party is justified in reposing confidence in another, the existence of a confidential or fiduciary relationship is generally a factual matter for the jury to resolve.

(Citations and punctuation omitted.) *Bienert v. Dickerson*, 276 Ga. App. 621, 624 (2) (a) (624 SE2d 245) (2005).

The trial court did not err in denying Cushing's motion for summary judgment on this count because questions of fact regarding the existence of a confidential relationship between Cushing and the investors are for a jury to decide.

6. For the reasons discussed supra in Divisions 1-5, it follows that the trial court did not err in denying summary judgment to Cushing on the plaintiffs' derivative claims for an accounting and constructive trust.

Accordingly, we affirm the trial court's order in Case No. A13A0736.

Case No. A13A0820

7. The plaintiffs in Case No. A13A0820 appeal the trial court's ruling that the financial instruments involving the Riverside, Fairfield, and Bartow transactions were not securities. For the reasons stated supra in Division 1, these transactions involved

23

securities under the Georgia Securities Act, OCGA § 10-5-1 et seq. Therefore, the trial court's order granting summary judgment to Cushing is reversed.

*Judgment affirmed in Case No. A13A0736 and reversed in Case No. A13A0820. Miller and Ray, JJ., concur.*

24