**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 18, 2025**

# In the Court of Appeals of Georgia

A25A0406. SHLAPAK et al. v. DAU.

McFADDEN, Presiding Judge.

This appeal stems from a business relationship between plaintiffs Milton Shlapak and Shlapak Development Company ("SDC")[1], on the one hand, and defendant Van Dau, on the other hand. Essentially, Shlapak and SDC argue that the parties had a partnership agreement; that in breach of that agreement and the fiduciary duties it imposed, Dau usurped partnership opportunities by diverting them to another entity with which Dau was associated; and that Dau failed to disclose those

---

[1] We use the acronym "SDC" to refer to an incorporated entity for which Shlapak serves as president. Shlapak has also done business as an unincorporated entity of the same name.

opportunities to Shlapak but instead affirmatively misrepresented that no opportunities existed.

The trial court granted summary judgment to Dau on the plaintiffs' various contract, tort, and equitable claims. Central to that decision was the trial court's holding that, as a matter of law, the parties had not entered into a partnership agreement and did not have a fiduciary or confidential relationship.

As detailed below, we disagree. We hold that a jury question exists as to whether the parties' agreement created a partnership and gave rise to fiduciary duties. This holding informs our review of the other issues in this appeal. Given that the parties may have had a fiduciary or confidential relationship by virtue of their agreement, we hold that a jury question exists about whether fraud by Dau tolled the statute of limitation until 2019, when Shlapak claims he first learned of the allegedly usurped opportunities. And we hold that jury questions exist as to the plaintiffs' claims for fraud, breach of contract, breach of fiduciary duty, an accounting, and attorney fees. We reverse the grant of summary judgment to Dau on those claims.

But we do not find error in the trial court's grant of summary judgment on the plaintiffs' claim for unjust enrichment. And the plaintiffs have made no argument

specifically related to the trial court's grant of summary judgment on their claims for the imposition of a constructive trust or equitable lien. We affirm the grant of summary judgment to Dau on those claims.[2]

1. *Facts*

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." *Peterson v. Peterson*, 303 Ga. 211, 213 (1) (811 SE2d 309) (2018) (citations and punctuation omitted). "On appeal from an order granting or denying summary judgment, we conduct a de novo review, construing the evidence and all reasonable conclusions and inferences therefrom in the light most favorable to the nonmovant." *State Auto. Mut. Ins. Co. v. Todd*, 309 Ga. App. 213, 213-214 (1) (709 SE2d 565) (2011) (citation and punctuation omitted).

So viewed, the evidence showed that Shlapak is a businessman with experience in development. In the 1980s, he became acquainted with Dau, a naturalized United

---

[2] Oral argument was held in this case on May 1, 2025, and is archived on the court's website. See Court of Appeals of Georgia, Oral Argument, Case No. A25A0406 (May 1, 2025), available at https://vimeo.com/1081277055.

States citizen originally from Laos. The two developed a close friendship as well as a business relationship.

Shlapak and Dau discussed the possibility of doing business together in Laos, and they traveled to that country where Dau facilitated Shlapak's introduction to persons in the Laotian government. In 1989, SDC entered into a memorandum with the Laotian government authorizing SDC to develop natural resources in Laos.

On February 16, 1992, SDC and Dau entered into an agreement ("the 1992 agreement") in which they agreed to

> voluntarily associate themselves together for the purpose of conducting general business with the government of Laos. The business (hereinafter referred to as the "Ventures") shall include but not be limited to:
>
> (a) Oil and gas concession (3800 sq km) joint venture with Monument Oil;
>
> (b) Hydroelectric dam development and associated timber reserves — presently under joint venture negotiation with Bechtel Corporation;
>
> (c) Iron mini/mill;
>
> (d) Oil refinery/port development on the coast of Vietnam;

(e) Mining projects;

(f) Infrastructure developments; and

(g) Such other business as may be agreed upon by and between the Parties.

Among other things, the agreement provided that the parties share "[a]ny net profits or losses of the Ventures . . . in equal proportions[,]" that they would "devote reasonably equal amounts of time and attention and use the utmost of [their] skills and ability in furtherance of the Ventures[,]" that they would "have an equal voice in the management of the Ventures[,]" and that they would not "have authority to bind the Parties in making contracts and incurring obligations in the name and on the credit of the Parties without the written express consent of the other Party." The agreement contained a merger clause and provided that it would "continue until dissolved by mutual agreement of the Parties."

In their business relationship, Shlapak "depended on [Dau] to tell [him] what was going on and what the projects were. . . ." Dau served as a translator to Shlapak, who did not speak the languages used in Laos. Dau, who ultimately moved back to Laos permanently, was, in Shlapak's words, "in the field with the people" while

Shlapak remained in the United States, and Shlapak relied on Dau to form relationships with people to advance their common interests.

In 2004, SDC entered into an agreement with a Thai company, CH. Karnchang Public Company Limited ("CK"), to develop a hydroelectric dam known as Nam Ngum II ("NNII"). As part of their agreement, SDC and CK formed Southeast Asia Energy Limited ("SEAN"), in which SDC received an equity stake. Although Dau was not a party to that agreement, Shlapak split SDC's equity stake equally with Dau, believing that it fell within the profit-sharing terms of the 1992 agreement.

Shortly thereafter, Dau's portion of the equity stake in SEAN was put into the name of an entity called, at various times, PT Construction or PT (Sole) ("PT"). Shlapak assumed PT was Dau's company. Although Dau testified that he personally had no ownership interest in PT, he was associated with the company; he served as PT's president and chairman, and the company was owned by Dau's brother and later, Dau's son.

In 2004 or 2005, Shlapak observed Dau leaving a meeting with CK, which surprised him because, as "the main person [with] rights to the dam," Shlapak had "always been included in meetings with [CK]." When Shlapak questioned Dau about

6

that meeting, Dau told him it was "nothing" and that he was "just looking into getting some work for [his] brother."

In fact, Dau was talking with CK about PT doing work on the infrastructure needed for resettlement of persons displaced by the NNII dam, and in 2006 SEAN and PT entered into an agreement for that work. Dau did not share with Shlapak the fact that PT would be doing the resettlement infrastructure work. PT later acquired, with Dau's assistance, other resource development work for the Laotian government.

In the meantime, Shlapak regularly asked Dau if there was further work that the two could do to advance projects under the 1992 agreement. Dau always replied that there was nothing to work on.

On February 28, 2014, SDC and Dau signed a new agreement ("the 2014 agreement") pertaining to their business relationship. At CK's suggestion, Dau had asked an attorney to draft the agreement to limit the projects subject to their business arrangement.

The 2014 agreement, which referred to the parties' relationship as a joint venture, differed from the 1992 agreement in several ways. First, it limited the projects that were subject to the agreement to the following: "(1) Construction and

7

development of the hydropower dam project known as Nam Bak I[;] (2) Construction and development of the hydropower dam project known as Nam Ngum II[; and] (3) Such other projects as the parties may agree in writing by an amendment to this Agreement."

In addition, the 2014 agreement provided that rather than sharing profits and losses equally, the parties would share or allocate profits and losses "pro rata according to the respective financial capital contributions made to such Project . . . ." The parties were no longer required to devote "reasonably equal amounts of time and attention" to their business, but rather to "devote such time and attention to the Joint Venture as [they] may in [their] reasonable discretion deem adequate and necessary for such purposes." And unlike the 1992 agreement, which prohibited either party from binding the parties without the other's express consent, the 2014 agreement gave Dau "full and complete authority, power, and discretion to manage and control the business, affairs, and properties of the Joint Venture, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Joint Venture's businesses."

Finally, the 2014 agreement contained language expressly superseding the 1992 agreement. It stated: "This Agreement is the sole and entire agreement of the parties hereto and supersedes any previous written or oral agreements or understandings between the parties hereto, and any and all such previous written or oral agreements or understandings between the parties hereto shall terminate upon the signing and delivery of this Agreement."

Dau presented the 2014 agreement to Shlapak for his signature while the two were at a social luncheon with their wives, and Shlapak signed it after glancing at its contents. Shlapak did not read it more carefully, ask Dau any questions, seek legal counsel, or ask for more time to consider it, because he trusted Dau and did not want to insult him.

In November 2019, while on a trip to Laos, Shlapak first learned that PT had built resettlement facilities associated with the NNII dam. Although some written materials in Shlapak's possession had referred to PT's involvement, he had not read those materials. And although PT's involvement may have been a topic at board meetings attended by Shlapak, the issue had not been discussed in English and Dau (who acted as Shlapak's translator) had not told him of it.

On January 10, 2022, Shlapak and SDC brought this action against Dau. As amended, the action asserted claims for: (1) accounting; (2) fraud; (3) breach of fiduciary duty; (4) breach of contract; (5) unjust enrichment; (6) attorney fees; and (7) the imposition of a constructive trust and equitable lien.

2. *Nature of the parties' relationship*

We first consider the nature of the parties' relationship, because that issue affects most if not all of the plaintiffs' claims against Dau. There are two aspects to this issue: (1) whether the 1992 agreement created a partnership between Dau and SDC that gave rise to fiduciary obligations; and if so, (2) whether that partnership and any claims arising from it survived the 2014 agreement. The trial court held that, as a matter of law, the 1992 agreement did not create a partnership. The trial court also held that, as a matter of law, the 2014 agreement terminated the 1992 agreement and "fully extinguished and discharged" any claims under the earlier agreement.

As detailed below, we do not agree with the trial court. We find that a question of fact exists as to whether the 1992 agreement created a partnership. And we find that, although the 2014 agreement did supersede the 1992 agreement, thereby ending

the parties' partnership, it did not extinguish any claims that may have accrued under the 1992 agreement.

(a) *The 1992 agreement created a partnership with fiduciary obligations*

"A partnership is an association of two or more persons to carry on as co-owners a business for profit. . . ." OCGA § 14-8-6 (a). It "can result from a contract, which may be either express or implied. Factors that indicate the existence of a partnership include a common enterprise, the sharing of risk, the sharing of expenses, the sharing of profits and losses, a joint right of control over the business, and a joint ownership of capital." *Seals v. Major*, 364 Ga. App. 239, 243 (1) (874 SE2d 423) (2022) (citation and punctuation omitted). With certain exceptions not applicable here, "[t]he receipt by a person of a share of the profits from a business is prima-facie evidence that he is a partner in the business[.]" OCGA § 14-8-7 (4). Moreover, the intention of the parties, discerned from the language of the contract, "will prevail over all other considerations." *Seals*, supra at 243-244 (1) (citation and punctuation omitted).

Whether or not a partnership exists "is generally a mixed question of law and fact, and can not be resolved as a matter of law unless the verdict one way or the other

11

is demanded by the evidence." *Seals*, 364 Ga. App. at 242-243 (1) (citation and punctuation omitted). The parties' intent to become partners is a question of fact for the jury "in the absence of an unambiguous contract of partnership or of any written articles of partnership[.]" Id. at 243 (1) (citation and punctuation omitted).

The 1992 agreement does not expressly state that it is establishing a partnership. But "we must look to the substance of the agreement rather than mere nomenclature in determining the intent of the parties." *Aaron Rents v. Fourteenth St. Venture*, 243 Ga. App. 746, 748 (1) (533 SE2d 759) (2000). And contrary to the trial court's assertion that the agreement was "devoid of language creating a partnership," the 1992 agreement contains several indicia of partnership. Its terms establish a common enterprise, "the purpose of conducting general business with the government of Laos," to include specified "Ventures"; provide that the parties share in equal proportions "[a]ny net profits or losses in the Ventures that may accrue to the Parties arising out of [their] association"; require them to "devote reasonably equal amounts of time and attention . . . in furtherance of the Ventures"; give them "an equal voice in the management of the Ventures"; and prohibit them from acting alone to bind the association to contracts or other obligations. Because these contractual terms would

authorize a finding that the parties intended to form a partnership, see *Aaron Rents*, 243 Ga. App. at 748 (1), the trial court erred in holding as a matter of law that no partnership existed.

(b) *Impact of the 2014 agreement on the 1992 agreement and claims arising therefrom*

We agree with the trial court that the 2014 agreement between SDC and Dau superseded the 1992 agreement. Its plain terms say so: "This Agreement is the sole and entire agreement of the parties hereto and *supersedes any previous written and oral agreements or understanding between the parties hereto*, and any and all such previous written or oral agreements or understandings between the parties hereto shall terminate upon the signing and delivery of this Agreement." (Emphasis supplied.)

The plaintiffs argue that the 2014 agreement did not terminate the 1992 agreement because, in procuring the 2014 agreement, Dau breached a fiduciary duty to SDC. We are not persuaded.

"[P]artners owe a duty to act in the utmost good faith with regard to one another. OCGA § 23-2-58[.]" *Chaney v. Burdett*, 274 Ga. 805, 807 (2) (560 SE2d 21) (2002). And Georgia recognizes the tort of wrongful dissolution of a partnership, whereby a partner acts in bad faith while exercising the statutory power to dissolve a

partnership at will. See *Jordan v. Moss*, 291 Ga. 39, 40-41 (727 SE2d 460) (2012); *Arford v. Blalock*, 199 Ga. App. 434, 437-438 (6) (405 SE2d 698) (1991), disapproved in part on other grounds by *Jordan*, 291 Ga. at 43.

But this case does not involve an at-will dissolution of a partnership by one of the partners; it involves the partners' execution of a new agreement that redefined their relationship and common enterprise. The plaintiffs have pointed to no evidence that Dau prevented Shlapak from reading the 2014 agreement or that Dau misrepresented its contents. To the contrary, while Shlapak had the ability and opportunity to read the 2014 agreement before signing it, he chose only to glance at it. Consequently, the plaintiffs are bound by the terms of the 2014 agreement, see *Godwin v. Mizpah Farms*, 330 Ga. App. 31, 37 (2) (a) (766 SE2d 497) (2014), and they have pointed to no evidence giving rise to a genuine issue of material fact regarding the enforceability of its provision superseding and terminating the 1992 agreement.

But even though the relationship created by the 1992 agreement ended when the parties executed the 2014 agreement, that later agreement did not purport to release any pre-existing claims. If Dau breached the earlier agreement while it was in effect, the plaintiffs could still seek to recover for that breach (assuming, of course,

that they filed their action within the applicable limitation period, an issue we address below). Similarly, if Dau committed torts during the period when the earlier agreement was in effect, the later agreement does not preclude the plaintiffs from seeking to recover for them. The trial court erred in holding otherwise.

3. *Statute of limitation*

We next consider whether the limitation periods applicable to the plaintiffs' various causes of action may have been tolled by fraud. This question affects all of the claims in this case because this lawsuit, filed on January 10, 2022, is based on actions that occurred years and even decades earlier, but the limitation periods applicable to the plaintiffs' claims are either four or six years. See OCGA § 9-3-24 (six-year limitation period governs breach of a written contract); *Coe v. Proskauer Rose*, 314 Ga. 519, 524-525 (2) (878 SE2d 235) (2022) (four-year limitation period governs fraud); *Chase Manhattan Mtg. Corp. v. Shelton*, 290 Ga. 544, 550 (5) (722 SE2d 743) (2012) (four-year limitation period governs unjust enrichment); *Godwin*, 330 Ga. App. at 38-39 (3) (b) & n. 8 (six-year limitation period governs breach of fiduciary duty arising from diversion of income owed under a partnership agreement; four-year limitation period governs breach of fiduciary duty involving misrepresentations).

"[A] statute of limitation begins to run on the date a cause of action on a claim accrues." *Armstrong v. Cuffie*, 311 Ga. 791, 794 (2) (860 SE2d 504) (2021) (citation and punctuation omitted). Generally, the limitation period is measured from the date upon which the plaintiff could have successfully maintained the action." Id. (citation and punctuation omitted).

But "[i]f the defendant [is] guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." OCGA § 9-3-96.

> [T]o toll a limitation period under this statute, a plaintiff must make three showings: first, that the defendant committed actual fraud; second, that the fraud concealed the cause of action from the plaintiff, such that the plaintiff was debarred or deterred from bringing an action; and third, that the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the statute of limitation.

*Coe*, 314 Ga. at 529 (3) (citation and punctuation omitted). Dau argues, and the trial court found, that as a matter of law the plaintiffs made none of these showings. We disagree, and instead hold that issues of fact exist as to whether the limitation period was tolled as to most of the plaintiffs' claims.

(a) *Actual fraud that debarred or deterred the plaintiffs from bringing their action*

16

"To benefit from tolling under OCGA § 9-3-96, [the plaintiffs] must first establish that [Dau] committed an actual fraud. Doing so requires a showing of either (1) actual fraud involving moral turpitude, or (2) a fraudulent breach of a duty to disclose that exists because of a relationship of trust and confidence." *Doe v. St. Joseph's Catholic Church*, 313 Ga. 558, 561 (2) (a) (870 SE2d 365) (2022) (citation and punctuation omitted).

A jury question exists as to whether the parties had a confidential relationship, either because the 1992 agreement created a partnership or due to other aspects of their relationship, such as Shlapak's dependence upon Dau to act as his translator and inform him of opportunities in Laos for their business association. See *Cushing v. Cohen*, 323 Ga. App. 497, 508 (5) (746 SE2d 898) (2013) ("a confidential relationship may be found whenever one party is justified in reposing confidence in another") (citation and punctuation omitted).

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners . . . and similar fiduciary relationships.

17

OCGA § 23-2-58. "(T)he determination as to whether a confidential relationship exists under a particular set of facts generally is a question for the trier of fact." *Doe*, 313 Ga. at 563 (2) (a) (citation and punctuation omitted).

A confidential relationship may give rise to an obligation to communicate material facts, the suppression of which could constitute fraud. OCGA § 23-2-53. Similarly, "[p]artners shall render, to the extent the circumstances render it just and reasonable, true and full information of all things affecting the partners to any partner . . . ." OCGA § 14-8-20. The 1992 agreement imposed upon the parties an obligation to "use the utmost of [their] skills and abilities in furtherance of the Ventures[,]" namely the "general business with the government of Laos" that the parties "voluntarily associate[d] themselves together for the purpose of conducting. . . ." The evidence, viewed most favorably to the plaintiffs, supports a finding that instead of using the utmost of his skills and abilities in furtherance of the parties' general business with Laos, Dau intentionally diverted business opportunities away from their partnership and toward another entity with which he was associated, PT. A jury could find that Dau was obligated to disclose to Shlapak the existence of those opportunities

and that his failure to do so, and, indeed, his affirmative misrepresentations that such opportunities did not exist, could support a finding of actual fraud.

Moreover, a jury could find that this fraud debarred or deterred the plaintiffs from bringing those causes of action that arise from diverted opportunities, such as the opportunity to perform the resettlement infrastructure work associated with the NNII dam. (As discussed below, one of the plaintiffs' causes of action — their claim for unjust enrichment based on Shlapak's conveyance of a share in SEAN to Dau — does not arise from the alleged diverted opportunities.)

Shlapak testified that he did not know until 2019 that Dau had diverted the work that arose from those diverted opportunities to PT while repeatedly telling Shlapak that no opportunities existed for their partnership. If the jury credited Shlapak on this point, the jury could find that Dau's failure to disclose that opportunity, as well as his misrepresentations about it, prevented Shlapak from filing his action within the limitation period.

(b) *Exercise of reasonable diligence to discover the cause of action*

Under OCGA § 9-3-96, "[f]raud will toll the limitation period only until the fraud is discovered or by reasonable diligence should have been discovered." *Coe*, 314

19

Ga. at 530 (3) (citation and punctuation omitted). We measure reasonable diligence objectively, rather than subjectively. Id. But "a confidential relationship imposes a greater duty on a defendant to reveal what should be revealed, and a lessened duty on the part of a plaintiff to discover what should be discoverable through the exercise of ordinary care." Id. (citation and punctuation omitted).

Dau argues that as a matter of law the plaintiffs failed to exercise reasonable diligence to discover that Dau had diverted opportunities to PT, pointing to evidence that PT's work was at times referenced in board meetings or written materials. But Shlapak testified that he did not recall hearing any such discussion at meetings; that he relied on Dau to translate what was said at meetings; and that he did not read all of the written materials but trusted Dau to provide him with relevant information. Under these circumstances,

> [w]e fail to see why a person exercising reasonable diligence would not be entitled to rely on the disclosure or lack thereof made by his [business partner, who, unlike Shlapak, was present in Laos and who also served as his translator], at least until other facts come to light that would cause a reasonably diligent person to revisit the issue. Thus, a genuine issue of material fact exists as to whether the [plaintiffs] had actual knowledge about [Dau's diversion of eligible partnership opportunities to PT], and we cannot say that, as a matter of law, the [plaintiffs] had [such]

knowledge [based solely on the evidence of what was said at the board meetings or contained in written materials].

*Coe*, 314 Ga. at 531 (3). See *Sanders v. Looney*, 247 Ga. 379, 381 (3) (276 SE2d 569) (1981) ("Ordinarily, questions of whether the plaintiff could have protected himself by the exercise of proper diligence are, except in plain and indisputable cases, questions for the jury.") (citations and punctuation omitted).

4. *Analysis of individual causes of action*

Having determined that questions of fact exist as to (1) whether the parties were in a partnership, and thus a fiduciary relationship, from 1992 to 2014; and (2) whether fraud by Dau tolled the running of the statute of limitation on most of the claims, we now turn to whether Dau was entitled to summary judgment on the individual causes of action asserted by the plaintiffs.

(a) *Fraud*

The plaintiffs asserted a claim for fraud based on Dau's alleged nondisclosures and affirmative misrepresentations about other eligible partnership opportunities that Dau diverted to PT. "The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting,

21

justifiable reliance by plaintiff, and damage to plaintiff." *Coe*, 314 Ga. at 526-527 (2) (citation and punctuation omitted).

Dau argues that he is entitled to summary judgment on this claim because, as a matter of law, the 1992 agreement "did not create a partnership or impose fiduciary duties." As discussed above, a question of fact exists on that issue.

Dau also argues that he is entitled to summary judgment on this claim because the plaintiffs have not pointed to specific evidence of reliance or damages. But Shlapak testified that he relied on Dau's false assurances that there were not any other eligible partnership opportunities for them to pursue, and as discussed above, we cannot say as a matter of law that his reliance was unjustified. See generally *Bristol Consulting Group v. D2 Property Group*, 366 Ga. App. 843, 850-851 (2) (884 SE2d 546) (2023) (a fiduciary relationship "encompasses a duty to disclose so that suppression of a material fact which a party is under an obligation to communicate constitutes fraud") (citation and punctuation omitted).

Moreover, a jury could find that at least one of the diverted opportunities identified by the plaintiffs — the infrastructure project between PT and CK related to the resettlement of persons displaced by the NNII dam — fell squarely within the

terms of the 1992 agreement, which defined the business of the partnership to include "[h]ydroelectric dam development" and "[i]nfrastructure developments[.]" The plaintiffs had an existing business relationship with CK, which worked with PT on the infrastructure project, and there is evidence that the infrastructure work began before the termination of the 1992 agreement. A jury could also find that the plaintiffs were damaged by losing the opportunity to receive the 50 percent share of the profits of that project, had it been developed by SDC.

(b) *Breach of fiduciary duty*

Like their fraud claim, the plaintiffs based their claim for breach of fiduciary duty on, in their words, Dau's "usurping [of] partnership opportunities, as well as [his] ongoing misrepresentations and non-disclosures to [the p]laintiffs that no such opportunities existed[.]" "A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *AgSouth Farm Credit, ACA v. West*, 352 Ga. App. 751, 755 (1) (835 SE2d 730) (2019) (citation and punctuation omitted).

As discussed above, questions of fact exist as to all of these elements: whether the 1992 agreement created a partnership relationship that imposed upon Dau a

23

fiduciary "duty to act in the utmost good faith with regard to each other[,]" *Chaney*, 274 Ga. at 807 (2); whether Dau's act of misrepresenting the availability of partnership opportunities and diverting at least the NNII dam resettlement infrastructure work to PT breached that duty; and whether such breach deprived the plaintiffs of a 50 percent share of the proceeds from that infrastructure project. Cf. *City of Atlanta v. Atlantic Realty Co.*, 205 Ga. App. 1, 4 (4) (421 SE2d 113) (1992) ("A member of a joint venture owes the duty to the other members of the venture to cooperate with them and to exercise reasonable care and skill to effectuate the purposes for which all have joined, and the duty not to disrupt or abandon the venture for the purpose of obtaining benefits for himself and not to do any act which obstructs the carrying on of its business to a successful conclusion[.]") (citation and punctuation omitted).

(c) *Breach of contract*

The plaintiffs claim that Dau breached the 1992 agreement by "usurping . . . partnership opportunities, concealing them from Plaintiffs, [and] failing to share on the agreed 50-50 basis the benefits of these opportunities[.]" We agree that genuine issues of material fact exist as to this claim.

As discussed above, a jury question exists as to whether the 1992 agreement created a partnership. If it did, that partnership lasted until the 2014 agreement superseded the earlier agreement. A jury question exists as to whether, during that time, opportunities arose for the parties to work on projects that fell within the descriptions of "Ventures" listed in the 1992 agreement, such as the resettlement infrastructure work for the NNII dam. And a jury question exists as to whether Dau, in connection with eligible partnership opportunities, fulfilled his contractual obligations, including his obligation to "use the utmost of [his] skills and ability in furtherance of [those] Ventures."

(d) *Accounting*

The trial court held that, because the parties were not in a partnership, Dau was entitled to summary judgment on the plaintiffs' claim for an accounting. Because a question of fact exists as to whether there was a partnership, we hold that a question of fact also exists as to whether the plaintiffs have a right to an accounting. See OCGA § 14-8-22 (setting forth the circumstances under which a partner has "the right to a formal accounting as to partnership affairs").

(e) *Unjust enrichment*

25

The plaintiffs asserted a claim for unjust enrichment as an alternative to their claim for breach of contract. "The theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." *Price & Co. v. Majors Mgmt.*, 363 Ga. App. 427, 436 (3) (b) (i) (869 SE2d 587) (2022) (citation and punctuation omitted). Such a claim

> exists where a plaintiff asserts that the defendant induced or encouraged the plaintiff to provide something of value to the defendant; that the plaintiff provided a benefit to the defendant with the expectation that the defendant would be responsible for the cost thereof; and that the defendant knew of the benefit being bestowed upon it by the plaintiff and either affirmatively chose to accept the benefit or failed to reject it.

*Campbell v. Ailion*, 338 Ga. App. 382, 387 (2) (790 SE2d 68) (2016).

We are not persuaded by Dau's argument that the parties' contractual relationship bars this claim as a matter of law. See *Marvin Hewett Enterprises v. Butler Capital Corp.*, 328 Ga. App. 317, 323 (4) (761 SE2d 857) (2014) ("Where there is an express contract, there can be no recovery based upon an unjust enrichment theory.") (citation and punctuation omitted). The plaintiffs assert it as an alternative theory of relief, given that the parties dispute the scope of their contractual obligations to each

other. See *Campbell*, 338 Ga. App. at 387-388 (2) (a plaintiff may assert alternative theories of unjust enrichment and breach of contract); *Fed. Ins. Co. v. Westside Supply Co.*, 264 Ga. App. 240, 248 (8) (590 SE2d 224) (2003) (an unjust enrichment claim will be moot if a plaintiff succeeds on a breach of contract claim, but if the breach of contract claim fails a jury question may remain as to unjust enrichment); *Ades v. Werther*, 256 Ga. App. 8, 10 (1) (567 SE2d 340) (2002) (where a jury question existed as to the existence or terms of a contract, summary judgment was not appropriate on a claim for unjust enrichment).

Nevertheless, we agree with Dau that the plaintiffs have not demonstrated the existence of a genuine issue of material fact as to this claim. The plaintiffs assert that Dau was unjustly enriched in two ways: (1) Dau received money on eligible projects diverted from the partnership; and (2) Shlapak, believing that SDC's profits from its work on the NNII dam should be shared equally with Dau under the 1992 agreement, conveyed to Dau half of SDC's share in SEAN.

The claim that Dau was unjustly enriched by receiving money on diverted projects fails as a matter of law, because the plaintiffs point to no evidence that either Shlapak or SDC conferred that benefit upon Dau. See *City of Atlanta v. Hotels.com*,

289 Ga. 323, 328 (4) (710 SE2d 766) (2011) ("to sustain a general claim of unjust enrichment, the [plaintiff is] required to show that it conferred a benefit to the [defendant] for which [the plaintiff] should be equitably compensated").

The claim that Dau was unjustly enriched by the transfer of half of SDC's share in SEAN is barred by the four-year statute of limitation. See *Chase Manhattan Mtg. Corp.*, 290 Ga. at 550 (5) (limitation period for unjust enrichment is four years). Shlapak conferred that benefit to Dau more than four years before the plaintiffs filed the action asserting this claim. And unlike the claims discussed above, the limitation period is not tolled as to this claim. The plaintiffs offer no argument for why the fraud that they allege tolled the statute of limitation — Dau's failure to disclose and his affirmative misrepresentations about other eligible partnership opportunities — debarred or deterred them from bringing a claim for unjust enrichment based on an entirely different benefit.

(f) *Constructive trust or equitable lien*

The plaintiffs also asserted a claim for the imposition of a constructive trust or equitable lien. But they make no argument specific to that claim in their appellate briefs. So we affirm the trial court's grant of summary judgment as to that claim.

5. *Attorney fees and costs*

Finally, the trial court granted summary judgment to Dau on the plaintiffs' request for attorney fees and costs, reasoning that the claim could not stand because the plaintiffs had no viable underlying claims. Because we reverse the grant of summary judgment as to some of those underlying claims, we also reverse the grant of summary judgment as to attorney fees and costs.

*Judgment affirmed in part and reversed in part. Hodges and Pipkin, JJ., concur.*